Vincent J. IPPOLITO, et al.,
Plaintiffs–Appellees,
Cross–Appellants,

v.

WNS, Inc., Defendant–Appellant,

and

Equifax Services, Inc.,
Defendant–Cross–Appellee.

Nos. 86–2776, 86–2777.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1987.

Decided Dec. 5, 1988.

against WNS and affirm the district court's decision to deny plaintiffs leave to amend.

## I.

## FACTUAL BACKGROUND AND PROCEEDINGS IN DISTRICT COURT

### A. *The Defendants.*

Defendant WNS is a Texas corporation in the business of, among other things, franchising picture frame and print stores under the name "Deck The Walls." WNS adopted the trademark "Deck The Walls" in May, 1982, after its trademark counsel conducted a search and advised WNS that it was free to use the mark. By the end of the summer of 1983, WNS had approximately fifty "Deck The Walls" franchises throughout the country.

Defendant Equifax is in the credit reporting business. It supplies credit information for use in both business and consumer transactions. In 1980, an Equifax sales representative, Jerrold White, had discussions with a WNS vice-president, William Boschma, concerning the use of Equifax's services by WNS. At that time, White was selling a particular category of what he described as "business credit type reports" called "Financial Control Services." Boschma told White that WNS was interested in obtaining a service that would assist WNS in screening prospective franchisees. White advised Boschma that the Equifax service suited to his needs was the "Special Service Character/Financial Report (Special Service Report)."[1] Equifax's Special Service Report is a standardized service that includes information about a person's credit standing, credit capacity, character, and reputation in the community. White testified at trial that a typical user of the Special Service Report is "looking at doing business in some capacity or

Paul S. Turner, McCullough Campbell & Lane, Chicago, Ill., for Equifax Services, Inc.

Wayne B. Giampietro, Poltrock & Giampietro, for Ippolito et al. Richard G. Lione, Willian, Brinks, Olds, Hofer, Gilson & Lione, Ltd., Chicago, Ill., for WNS, Inc.

Before RIPPLE and MANION, Circuit Judges, and REYNOLDS, Senior District Judge.[*]

MANION, Circuit Judge.

Plaintiffs sued WNS, Inc. (WNS) and Equifax Services, Inc. (Equifax), alleging violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681–1681t. A jury found for plaintiffs on their claims against WNS and against plaintiffs on their claims against Equifax. WNS appeals, claiming that the jury's verdict was not supported by substantial evidence. Plaintiffs have filed a cross-appeal, claiming that the district court abused its discretion by denying them leave to amend their complaint to assert an additional ground of liability against Equifax. We reverse the judgment

[*] Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

[1] Some of the reports that are the subject of this appeal are labeled "Special Service Character/Financial Reports" while others are labeled "Special Service Reports." An Equifax employee testified that these are separate, but substantially identical types of reports; the Special Service Character/Financial Reports apparently place a higher emphasis on the non-financial information about the subject of the report. For purposes of addressing any of the issues on appeal, the parties have not argued that there is any difference between the reports and we perceive no difference. For ease of reference, we refer to both types of reports as "Special Service Reports."

being associated with in some capacity from a business standpoint with the individual" who is the subject of the report. White also testified that he did not mention the FCRA regarding the Special Service Reports because the reports were being used for business purposes as opposed to consumer purposes.

At that same meeting, White also informed Boschma of other services that Equifax sold. One of the services White mentioned was the "Personnel Selection Report." This Equifax service is designed for use in screening prospective employees. When Boschma expressed interest in this service, White advised Boschma that the "Personnel Selection Report" was a "consumer report" covered by the FCRA. White told Boschma that WNS would have to comply with the FCRA when ordering those reports and gave Boschma a brochure outlining the FCRA's requirements.

Before accepting WNS as a customer, Equifax required WNS to sign a certification agreement that provided in part that "consumer reports, as defined by the Fair Credit Reporting Act, will be ordered only when intended to be used as a factor in establishing a consumer's eligibility for new or continued credit, collection of an account, insurance, licensing, employment purposes, or otherwise in connection with a legitimate business transaction involving the consumer." Boschma signed this certification agreement on WNS's behalf.

After WNS signed the certification agreement, Equifax assigned WNS an account number. Thereafter, WNS's Franchise Development Department regularly requested Special Service Reports on prospective franchisees. For example, from January, 1984 through May, 1984, WNS ordered approximately 30 to 40 Special Service Reports.

### B. *The Plaintiffs.*

Plaintiffs are three sisters and their husbands. The sisters, Judy Ippolito, Nancy Gerenstein, and Peggy Goodman, own and operate Deck The Walls, Inc. (DTW). DTW is incorporated in Illinois and is wholly owned by the three sisters. The compa-ny, operated out of the Gerenstein's residence, is in the business of custom framing, wall decorations, wall groupings, wall hangings, and millinery productions. The sisters' husbands, Vincent Ippolito, Wayne Gerenstein, and Michael Goodman, are not actively involved in the operation of the business and do not own any of the stock.

### C. *The Trademark Dispute and WNS's Investigation.*

In the latter half of 1983, DTW became aware of WNS's use of the trademark "Deck The Walls." DTW then contacted WNS and charged WNS with infringement of DTW's rights in that mark. DTW claimed that it had exclusive, nationwide rights to use that mark on picture frame products and services. DTW then offered to relinquish its rights to the mark for $100,000 but no settlement was ever reached. On January 4th, 1984, DTW filed a Notice of Opposition in the Patent & Trademark Office challenging WNS's application for registration of that mark.

As a result of the trademark dispute, WNS began an investigation of DTW and plaintiffs. WNS initially learned that Judy Ippolito, Nancy Gerenstein, and Peggy Goodman were involved in the business. WNS then ordered Special Service Reports on them. The Special Service Report on Judy Ippolito also contained information on her husband, Vincent, and stated that the Ippolitos had been in business together. Thereafter, WNS ordered Special Service Reports on Wayne Gerenstein and Michael Goodman.

Two of WNS's in-house attorneys testified that they ordered the Special Service Reports to find out more about the individuals behind a small, closely-held family corporation that was claiming exclusive, nationwide rights to the trademark "Deck the Walls." One of these attorneys instructed the administrative assistant in WNS's Franchise Development Department responsible for ordering Special Service Reports on prospective franchisees to order the reports on plaintiffs. Neither attorney inquired into WNS's relationship with Equifax or reviewed the requirements of the

FCRA. The administrative assistant who ordered the reports testified that she did not know why the reports were requested and that she did not give a reason to Equifax why the reports were requested.

Amelia Specht, an Equifax employee who prepared some of the Special Service Reports on plaintiffs, testified for plaintiffs as an adverse witness. Specht testified that when a customer calls in to request a report on a particular individual she only asks for the customer's account number, the name of the person requesting the report, and the type of report the customer would like prepared. According to Specht, she prepares different types of reports for Equifax's customers. For example, she prepares "Personnel Reports" for employers who want information on prospective employees as well as "Individual Reports" which apparently may be used for any purpose. She stated that the Special Service Reports are like the "Personnel Reports" and the "Individual Reports" except they delve deeper into information about the subject of the report, including the person's reputation in the community. She also testified that she does not ask why the customer wants a Special Service Report, and that, because it is a standardized service, the purpose for which the report is request-

ed does not affect the way she prepares a report.

The Special Service Reports prepared about plaintiffs contained information about plaintiffs' employment status, reputation in the community, credit history, and credit capacity. The reports also indicated that plaintiffs' neighbors had been questioned. Besides plaintiffs' neighbors, sources for the Equifax reports included banks, legal reporting services, and a credit bureau. In addition, the reports showed that Equifax conducted a check of its own files for information on the plaintiffs. Neither WNS nor Equifax notified plaintiffs that the reports had been requested.

### D. *Proceedings In District Court.*

On January 30th, 1986, the three couples sued WNS and Equifax alleging that the defendants violated the FCRA. Plaintiffs' complaint[2] contained three counts against WNS and two counts against Equifax. Plaintiffs alleged that WNS violated the FCRA: by requesting "consumer reports" for a purpose not authorized under 15 U.S.C. § 1681b;[3] by procuring an "investigative consumer report" without notifying plaintiffs in violation of 15 U.S.C. § 1681d(a);[4] and by obtaining the reports

---

**2.** The plaintiffs actually submitted three complaints, one complaint for each couple. The complaints are all substantially identical and we will refer to them as "plaintiffs' complaint."

**3.** 15 U.S.C. § 1681b provides:
**Permissible purposes of consumer reports**
 A consumer reporting agency may furnish a consumer report under the following circumstances and no other:
 **(1)** In response to the order of a court having jurisdiction to issue such an order.
 **(2)** In accordance with the written instructions of the consumer to whom it relates.
 **(3)** To a person which it has reason to believe—
 **(A)** intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
 **(B)** intends to use the information for employment purposes; or
 **(C)** intends to use the information in connection with the underwriting of insurance involving the consumer; or

**(D)** intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status: or
 **(E)** otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

**4.** 15 U.S.C. § 1681d(a) provides in relevant part:
**Disclosure of investigative consumer reports**
**Disclosure of fact of preparation**
 **(a)** A person may not procure or cause to be prepared an investigative consumer report on any consumer unless—
 **(1)** it is clearly and accurately disclosed to the consumer that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made, and such disclosure (A) is made in a writing mailed, or otherwise delivered, to the consumer, not later than three days after the date on which the report was first requested, and (B) includes a statement informing the consumer of his right to

under false pretenses in violation of 15 U.S.C. § 1681q.[5] Plaintiffs contended that Equifax violated the FCRA: by preparing a "consumer report" on plaintiffs for a purpose not permitted under 15 U.S.C. § 1681b; and by not notifying plaintiffs that it had prepared an "investigative consumer report" as allegedly required by 15 U.S.C. § 1681d(a).

Equifax moved to dismiss both plaintiffs' claims against it. Equifax contended that it did not violate 15 U.S.C. § 1681b because WNS requested the Special Service Reports for purposes not covered by the FCRA. Equifax moved to dismiss plaintiffs' § 1681d(a) claim on the ground that § 1681d(a) only requires the user of an "investigative consumer report," not the consumer reporting agency who prepared the report, to notify the subjects of the report that the report was requested.

Relying on *Heath v. Credit Bureau of Sheridan, Inc.*, 618 F.2d 693 (10th Cir. 1980), the district court denied Equifax's motion to dismiss plaintiffs' § 1681b claim against it. *See Ippolito v. WNS, Inc.*, 636 F.Supp. 471 (N.D.Ill.1986). The district court held that the purpose for which a person requests a report is not determinative on the issue of whether a particular report is a "consumer report" under the FCRA. According to the district court, the inquiry into whether the "Special Service Reports" were "consumer reports" also required inquiry into the reasons why Equi-

fax prepared the reports. The district court did, however, grant Equifax's motion to dismiss plaintiffs' § 1681d(a) claim against it. The district court held that § 1681d(a) only required the report's user, not the consumer reporting agency, to notify the subject of an "investigative consumer report" that the report had been requested.

The case was then tried before a jury from August 18 through August 20, 1986. During the afternoon of Thursday, August 14, Equifax received a proposed jury instruction from plaintiffs setting forth circumstances under which the jury could find Equifax liable to plaintiffs under 15 U.S.C. § 1681e(a).[6] No prior pleading of the plaintiffs sought relief from Equifax under that statutory provision. On the morning of trial, Equifax moved for an order excluding any evidence offered by plaintiffs to show that Equifax violated 15 U.S.C. § 1681e(a). At that time, plaintiffs moved to amend their complaint to add a § 1681e(a) claim against Equifax.[7] The district court ruled in Equifax's favor, denying plaintiffs' motion to amend their complaint. At the close of their case, plaintiffs again moved to amend their complaint to add a § 1681e(a) claim against Equifax. This time, plaintiffs asserted that the complaint should be amended to make the pleading conform to the evidence presented at trial. The district court also denied this motion.

request the additional disclosures provided for under subsection (b) of this section ...

**5.** 15 U.S.C. § 1681q provides:

**Obtaining information under false pretenses**

Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined not more than $5,000 or imprisoned not more than one year, or both.

**6.** 15 U.S.C. § 1681e(a) provides:

**Compliance procedures**

(a) Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title. These procedures shall require that prospective users of the information identify themselves, certify the purposes

for which the information is sought, and certify that the information will be used for no other purpose. Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.

**7.** Equifax argues on appeal that plaintiffs did not move to amend their complaint at the beginning of trial. We disagree. Although plaintiffs did not file a formal motion, from the context of the record it is clear that the parties' arguments over Equifax's motion *in limine* were, for the most part, over whether plaintiffs were going to be able to amend their complaint to proceed against Equifax under § 1681e(a).

After the defendants rested, all the parties moved for directed verdicts. The district court denied all the motions and submitted the case to the jury. With regards to WNS's liability, the district court instructed the jury:

In order to prevail on their claims against Defendant WNS, INC., the burden is on the Plaintiffs to establish by a preponderance of the evidence the following elements:

1.a. That Defendant WNS, INC. negligently caused consumer reports to be prepared on them by a Consumer Reporting Agency for a purpose other than that allowed by the Fair Credit Reporting Act . . . ;

or

b. That Defendant WNS, INC. caused investigative consumer reports to be prepared on them and failed to disclose to Plaintiffs that such report was made and further failed to inform Plaintiffs of their right to request additional disclosures of the information;

or

c. Obtained a consumer report or investigative consumer report on them by false pretenses.

and

2. That Plaintiffs were damaged by such actions.

The district court also instructed the jury that:

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized by the Fair Credit Reporting Act. Those other purposes authorized by the Act include any legitimate business need for the information in connection with a business transaction involving the plaintiffs. The parties agree that Equifax is a consumer reporting agency.

WNS objected to this instruction on the ground that it allowed the jury to find that the Special Service Reports ordered on plaintiffs were "consumer reports" even if the reports were used, expected to be used, or collected solely for business transactions that did not involve a "consumer relationship" between WNS and the subject of the report.

The jury found in plaintiffs' favor against WNS and awarded plaintiffs a total of $700 in actual damages and $27,000 in punitive damages. The jury, however, found against plaintiffs on their claims against Equifax. The district court then awarded plaintiffs $27,500 in attorneys' fees and $1,795.89 in costs from WNS.

After the jurors returned their verdict, WNS moved for a judgment notwithstanding the verdict. WNS contended that the jury's verdict could not stand because the undisputed evidence established that the Special Service Reports it ordered on plaintiffs were not "consumer reports" as that term is defined in the FCRA. WNS also argued that, even if the reports were consumer reports, the award of compensatory and punitive damages could not stand because there was no evidence that it acted negligently or willfully. See 15 U.S.C. § 1681n (punitive damages can only be awarded for willful violations of the FCRA) and 15 U.S.C. § 1681o (actual damages, costs, and attorney's fees can only be awarded for negligent violations of the FCRA). In addition, plaintiffs filed a motion for a new trial on the grounds that the district court abused its discretion by denying plaintiffs' leave to amend their complaint to allege a § 1681e(a) claim against Equifax. The district court denied both motions.

## II.

## WNS'S APPEAL

WNS's liability in this case is premised upon three separate statutory vio-

lations. The district court instructed the jury that it could find WNS liable if: (1) WNS violated § 1681b by negligently causing consumer reports to be prepared on plaintiffs for a purpose other than those allowed by § 1681b; (2) WNS violated § 1681d(a) by causing "investigative consumer reports" to be prepared on plaintiffs without notifying plaintiffs that the reports were requested and notifying plaintiffs of their right to request additional disclosure from WNS; or (3) WNS violated § 1681q by obtaining a "consumer report" or an "investigative consumer report" on plaintiffs through the use of false pretenses. The jury found against WNS in a single verdict for each plaintiff without specifying which statutory provision or provisions that it found WNS had violated. Thus, we must

affirm if the evidence supports holding WNS liable under any of these provisions.[8]

■ Although plaintiffs asserted that WNS was liable under three very different statutory provisions, the resolution of the issues on this appeal all center around the definition of the term "consumer report." As the jury was instructed, if the Special Service Reports are not "consumer reports," then the FCRA does not cover any of WNS's actions. (An investigative consumer report is simply a particular species of "consumer reports";[9] if a particular report is not a "consumer report," it is also not an "investigative consumer report.") Moreover, the question of WNS's liability is not limited simply to the question of whether the Special Service Reports ordered on plaintiffs were "consumer re-

---

**8.** To avoid confusion over the extent of our holding we must mention that we have serious reservations about whether the instructions on two out of the three issues accurately reflected the FCRA. First, we have serious doubts as to whether merely negligently requesting a consumer report violates the FCRA. A person may violate the FCRA by obtaining a consumer report through the use of false pretenses. See 15 U.S.C. § 1681q. A person may also violate the FCRA if he requests an "investigative consumer report" without giving a consumer notice within three days of the request for the report that such a report has been requested. The statute does not, however, appear to impose any liability upon a person merely for "negligently causing" a consumer report to be prepared for an impermissible purpose. WNS's liability for negligently causing a consumer report to be prepared is premised upon § 1681b. But § 1681b only limits the dissemination of "consumer reports" by "consumer reporting agencies." It does not, by its plain terms, place any duty upon persons to refrain from requesting consumer reports from individuals for purposes not authorized by the FCRA. *See generally Heath v. Credit Bureau of Sheridan, Inc.,* 618 F.2d 693 (10th Cir.1980); *Rice v. Montgomery Ward & Co., Inc.,* 450 F.Supp. 668 (M.D.N.C.1978). WNS, however, has not argued on appeal that § 1681b does not apply to a person who requests a "consumer report" so we assume for purposes of this appeal that negligently requesting a consumer report for a purpose not authorized by § 1681b violates that statutory provision.

Another significant issue the parties have ignored on appeal is the district court's instruction on the § 1681q issue. The district court instructed the jury that it could find WNS liable for violating § 1681q if it "obtained a *consumer or investigative consumer report* on [plaintiffs]

by false pretenses." (Emphasis added.) Section 1681q, however, prohibits a person from knowingly and willfully obtaining *"information* on a consumer" through the use of false pretenses. (Emphasis added.) Unlike § 1681b and § 1681d(a), liability under § 1681q does not appear to be constrained by the technical definition of the term "consumer report." *See Kennedy v. Border City Savings & Loan Ass'n,* 747 F.2d 367 (6th Cir.1984); *see also Zamora v. Valley Federal Savings & Loan Ass'n,* 811 F.2d 1368 (10th Cir.1987). Plaintiffs, however, have not argued on appeal that the district court's instruction was erroneous, nor have they asked that the case be remanded for consideration of this issue if the district court is reversed. As such, any such argument is deemed waived. *See Hartford Accident and Indemnity Co. v. Sullivan,* 846 F.2d 377, 385 (7th Cir.1988), *petition for cert. filed,* Oct. 4, 1988; *White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1397 (5th Cir.1983).

**9.** 15 U.S.C. § 1681a(e) provides:
(e) The term "investigative consumer report" means a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information. However, such information shall not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer.

ports." A person cannot be held liable under the FCRA unless they negligently violated the statute. See 15 U.S.C. § 1681*o*. As the issues are presented on this appeal, that means that there must be evidence in the record that WNS failed to comply with the applicable provisions of the FCRA under circumstances where WNS either knew or should have known that the Special Service Reports on plaintiffs were "consumer reports." *Compare Houghton v. New Jersey Mfrs. Ins. Co.,* 795 F.2d 1144, 1148 (3d Cir.1986) (no FCRA violations where company had no reason to believe that a report was a consumer report) with *Hansen v. Morgan,* 582 F.2d 1214, 1216–18 (9th Cir.1978) (FCRA found to have been violated under circumstances where retailer had reason to know that a particular report was a consumer report). As we explain below, we reverse the judgment against WNS on all three asserted grounds of liability because there is no substantial evidence in the record to show that WNS knew or should have known that the Special Service Reports were "consumer reports" as that term is defined in the FCRA.

■ The starting point for our consideration of the issues is the statutory definition of the term "consumer report." 15 U.S.C. § 1681a(d) defines "consumer report" as:

[A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household pur-

poses, or (2) employment purposes, or (3) other purposes authorized under [15 U.S. C. §] 1681b....

15 U.S.C. § 1681b, which completes the definition of a consumer report, provides in relevant part:

A consumer reporting agency may furnish a consumer report under the following circumstances and no other:

. . . . .

(3) To a person it has reason to believe—

. . . . .

(E) ... has a legitimate business need for the information in connection with a business transaction involving the consumer.

15 U.S.C. § 1681b.

As defined in §§ 1681a(d) and 1681b, not all reports containing information on a consumer are "consumer reports." To constitute a "consumer report," the information contained in the report must have been "used or expected to be used or collected in whole or in part" for one of the purposes set out in the FCRA. Thus, a consumer may establish that a particular credit report is a "consumer report" falling within the coverage of the FCRA if: (1) the person who requests the report actually uses the report for one of the "consumer purposes" set forth in the FCRA; (2) the consumer reporting agency which prepares the report "expects" the report to be used for one of the "consumer purposes" set forth in the FCRA; or (3) the consumer reporting agency which prepared the report originally collected the information contained in the report expecting it to be used for one of the "consumer purposes" set forth in the FCRA. *See Heath,* 618 F.2d at 695–96; *Hansen,* 582 F.2d at 1218.[10]

---

**10.** Contrary to *Heath* and *Hansen,* many cases have either expressly or implicitly limited their consideration of whether a particular report is a consumer report to examining the purposes for which a particular report is requested by the report's user. *See, e.g., Hovater v. Equifax, Inc.,* 823 F.2d 413 (11th Cir.1987); *Matthews v. Worthen Bank & Trust Co.,* 741 F.2d 217 (8th Cir.1984); *Henry v. Forbes,* 433 F.Supp. 5 (D.Minn.1976); *Sizemore v. Bambi Leasing*

*Corp.,* 360 F.Supp. 252 (N.D.Ga.1973). We agree with *Heath* and *Hansen,* however, that the plain language of the statute, "used or expected to be used or collected in whole or in part" requires inquiry into the reasons why the report was requested and why the information contained in the report was collected or expected to be used by the consumer reporting agency. Because of the circular definition of "consumer report," § 1681b's limitations on the dissemination of

■ None of the parties contend that the Special Service Reports are consumer reports in that they were actually used for one of the consumer purposes set forth in the FCRA. Plaintiffs and WNS agree that using reports to evaluate persons associated with a corporate litigant is a "non-consumer purpose" under the FCRA. Thus, we assume that the reason why WNS actually used the report is an impermissible non-consumer purpose. This still leaves open the question of whether the reports were "consumer reports" because Equifax either expected the reports to be used for a consumer purpose or originally collected the information contained in the reports expecting the information to be used for a consumer purpose, and, if either of those questions is answered affirmatively, also the question of whether WNS knew or should have known that the reports were "consumer reports."

### A. *The Purpose For Which Equifax Expected The Report To Be Used.*

■ As explained above, a report on a consumer falls within the definition of a consumer report if a consumer reporting agency expects the report to be used for a consumer purpose. Plaintiffs claim that WNS should be held liable for requesting "consumer reports" because WNS "certified" to Equifax that it would only request "consumer reports" and that it would state the purpose for which a report was requested. If WNS did certify that it would only request "consumer reports," then it would logically follow that the reports were "consumer reports" because Equifax would expect the reports to be used only for consumer purposes. It would also logically follow that WNS, at the least, should have known that Equifax expected the information to be used for consumer purposes. WNS did not, however, certify that it would request only consumer reports

from Equifax. The certification agreement signed by WNS stated in relevant part:

We certify that consumer reports, as defined by the Fair Credit Reporting Act, will be ordered only when intended to be used as a factor in establishing a consumer's eligibility for new or continued credit, collection of an account, insurance, licensing, employment purposes, or otherwise in connection with a legitimate business transaction involving the consumer. Each request for a report will further indicate the specific purpose involved in each transaction and such reports will be used for no other purpose.

The certification agreement states only that WNS would order "consumer reports" when it intended to use them for the consumer purposes set forth in the FCRA. It does not state that WNS would order only "consumer reports."

■ Moreover, the fact that WNS did not tell Equifax the purpose for which it ordered the Special Service Reports on plaintiffs does not magically transform the reports into consumer reports. That WNS did not tell Equifax why it requested the reports does not have any bearing on the purposes for which the report was actually "used or expected to be used or collected." Failing to disclose that a report is requested for a non-consumer purpose might help to establish that a report was obtained under false pretenses if a person certified that it would only use reports for consumer purposes. *Cf. Hansen*, 582 F.2d at 1218–20 & n. 3 (holding that retailer, who certified that he would only use consumer reports for permissible purposes under the FCRA, obtained reports under false pretenses when it ordered a consumer report on an individual for an impermissible purpose without informing credit bureau of that purpose). Such evidence is irrelevant, however, in determining whether a report is a "consumer report" in the first place.

consumer reports are essentially rendered meaningless if the sole determination of whether a report is a consumer report is made solely by looking at the reason for which the report is requested. Under such an analysis, if a person requests a consumer report for a purpose set forth in § 1681b, a consumer reporting agency

is free to give that person the report. On the other hand, if a report is not requested for one of the purposes set forth in § 1681b, it would not, under this view, be a "consumer report" covered by the FCRA. In such a case, a consumer reporting agency would also be free to give away the same information.

The record does show that Equifax regularly prepared Special Service Reports for WNS so that WNS could evaluate prospective franchisees. Thus, while WNS did not tell Equifax why it ordered the reports on plaintiffs, the jury could reasonably infer that Equifax expected the report to be used for that purpose. Evaluating prospective franchisees, however, does not fall within the definition of the term "consumer report."

The only provision of the FCRA that has any apparent applicability to the report made for the purpose of evaluating prospective franchisees is § 1681b(3)(E). Section 1681b(3)(E), which contains the Act's final permissible purpose for which a consumer reporting agency may furnish a consumer report, states that a consumer reporting agency may provide a consumer report to a person it believes "otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer." The Act simply defines "consumer" as an "individual." 15 U.S.C. § 1681a(c). Thus, if the terms of § 1681b(3)(E) are incorporated without qualification into the definition of a consumer report, any report concerning a "business transaction" with an individual would fall under the definition of a "consumer report," even if the report was collected and used solely for an obviously "non-consumer" purpose, such as evaluating prospective franchisees. The district court agreed with this broad construction of the term "consumer report" and, over WNS's objections, so instructed the jury. We agree with WNS that the district court's instruction was erroneous.

The courts have all too frequently been called on to interpret the broad "business transaction" language of § 1681b(3)(E). The significant problem § 1681b(3)(E) causes is that if its broad "business transaction" language is incorporated without qualification into the definition of "consumer report," most of the other provisions of §§ 1681a(d) and

1861b(3) would be rendered a nullity. If Congress intended information concerning any "business transaction" involving a consumer to fall within the definition of a consumer report, there would have been no reason to place into the statute § 1681a(d)'s precisely drawn language referring to information "used or expected to be used or collected ... for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes; or (2) employment purposes...." As the court stated in *Cochran v. Metropolitan Life Ins. Co.*, 472 F.Supp. 827, 830–31 (N.D.Ga.1979):

> If such a catch-all reading of [§ 1681b(3)(E)'s "business transaction" provisions] is derived, the specifics of the preceding sections and subsections are rendered meaningless. There is no reason to enumerate covered reports if ultimately all reports are included. An allowance of any other imaginable reports involving consumers would logically conflict with the precision and specifics of § 1681a.

To resolve the apparent conflict between § 1681a(d) and § 1681b(3)(E), the courts have consistently recognized § 1681a as the "primary" definitional section and, in cases of conflict between § 1681a and § 1681b, have conformed the breadth of § 1681b to the more precisely drawn language in § 1681a. *See Houghton*, 795 F.2d at 1149–50; *see also Hovater v. Equifax, Inc.*, 823 F.2d 413, 419 (11th Cir.1987); *Cochran*, 472 F.Supp. at 830–31. *Contra Beresh v. Retail Credit Co.*, 358 F.Supp. 260 (C.D.Cal.1973). In other words, the definition of "consumer report" has essentially been limited to information that is "used or expected to be used or collected" in connection with a "business transaction" involving one of the "consumer purposes" set out in the statute, that is, eligibility for personal credit or insurance, employment purposes, and licensing. *See Houghton*, 795 F.2d at 1149–50; *see generally Hovater v. Equifax*, 823 F.2d at 419.[11]

---

11. One of the problems in giving § 1681b(3)(E) a restrictive definition as it relates to the definition of a "consumer report" is that it can also be viewed as reading § 1681b(3)(E) out of the Unit-

Another important reason to avoid incorporating § 1681b(3)(E) without qualification into the definition of "consumer report" is to keep the statute within the bounds Congress intended. In enacting the FCRA, Congress sought to regulate the dissemination of information used for consumer purposes, not business purposes. *See Matthews v. Worthen Bank & Trust Co.,* 741 F.2d 217, 219 (8th Cir.1984) (report on individual in connection with lease of facilities in shopping mall not covered by FCRA); *see also Boothe v. TRW Credit Data, Inc.,* 523 F.Supp. 631, 633 (S.D.N.Y. 1981). Representative Sullivan, one of the FCRA's sponsors in the House, stated:

> The purpose of the fair credit reporting bill is to protect consumers from inaccurate or arbitrary information in a consumer report, which is used as a factor in determining an individual's eligibility for credit, insurance or employment. *It does not apply to reports utilized for business, commercial, or professional purposes.*

116 Cong.Rec. 36,572 (1970) (remarks of Representative Sullivan). (Emphasis added.) *See generally,* Note *Judicial Construction of the Fair Credit Reporting Act,* 76 Colum.L.Rev. 458 (1978) (discussing legislative history of FCRA). Incorporating § 1681b(3)(E) literally into the definition of consumer report would violate the clearly expressed legislative intent that reports collected for "business, commercial, and professional purposes" do not fall under the FCRA.

Thus, because evaluating prospective franchisees does not fall within one of the consumer purposes set forth in the FCRA, there is no substantial evidence in the record to support plaintiffs' position that Equifax "expected" the consumer report to be used for one of the consumer purposes set forth in the FCRA. This obviates any need for us to inquire whether liability could be properly imposed against WNS because it knew or should have known of any such expectation on the part of Equifax.

**B.** *The Purposes For Which Equifax Originally Collected The Information.*

As discussed above, WNS cannot be held liable for failing to comply with a provision of the FCRA based simply upon the purposes for which the Special Service Reports on plaintiffs were used or expected to be used. The fact that the reports are

---

ed States Code and as restricting the permissible purposes for which a consumer report may be disseminated. *See Houghton,* 795 F.2d at 1152–54 (Sloviter, J., concurring). The fact that § 1681b(3)(E) is viewed restrictively for purposes of *defining* a consumer report does not mean that it has to be viewed so restrictively in determining the *permissible purposes* for which a report may be furnished by a consumer reporting agency. As one writer has suggested, this may be done simply by looking at the "primary purposes" served by § 1681a(d) and § 1681b. *See* Note *Judicial Construction of the Fair Credit Reporting Act,* 76 Colum.L.Rev. 458 (1976). The primary purpose of § 1681a(d) is to define the term "consumer report." To effectuate that primary purpose, that section's precisely drawn language should take precedence over § 1681b when a court is examining whether a particular report falls within the definition of a "consumer report." On the other hand, the primary purpose of § 1681b is to set forth the permissible purposes for which a consumer report may be furnished by a consumer reporting agency. In determining whether a "consumer report" was disseminated for a permissible purpose, § 1681b(3)(E)'s broader language should then take precedence over § 1681a(d)'s more restrictive language. In other words, information that is collected and used for business transactions does not fall within the definition of a consumer report. But the mere fact that information is collected for a consumer purpose does not prevent that information from subsequently being furnished to a person who has a legitimate business need for the information.

While there is no completely satisfactory way to resolve the conflict between of § 1681b(3)(E) and § 1681a(d), this appears to be the only way to construe the statute to give meaning to all the provisions in § 1681a(d) and § 1681b. By limiting the expansive definition of § 1681b(3)(E) as it is incorporated into § 1681a(d), § 1681a(d)'s precise language is not rendered meaningless. Moreover, this is entirely consistent with the congressional intent that business reports are not covered by the FCRA. On the other hand, giving § 1681b(3)(E) a broad definition in terms of the permissible purposes for which a consumer report may be furnished prevents that statutory provision from being read out of the statute. It also allows consumer reports to be used for legitimate business purposes while preventing the use of consumer reports for improper purposes.

neither used nor expected to be used for a consumer purpose, however, does not necessarily mean that the report is not a consumer report. The definition of consumer report also looks at why the information contained in the report was originally collected or expected to be used. In other words, even if a report is used or expected to be used for a non-consumer purpose, it may still fall within the definition of a consumer report if it contains information that was originally collected by a consumer reporting agency with the expectation that it would be used for a consumer purpose. The record in this case, however, is devoid of basic information concerning why Equifax collected the information used in the Special Service Reports on plaintiffs. Nor is there more general information on how or why Equifax stores information. Nonetheless, it does appear from the record that Equifax follows the same procedures in doing "in-file" checks for "Personnel Reports" as it does for Special Service Reports. Because "Personnel Reports" are designed for a "consumer purpose," this appears to raise an inference that the Special Service Reports were "consumer reports" because some of the information used in the Special Service Reports was, at least, "expected to be used" for a consumer purpose when Equifax collected it. The fact that the reports may be consumer reports because Equifax originally collected the information for consumer purposes, however, is simply an insufficient basis upon which to impose liability against WNS. Whether Equifax may have originally collected the information for consumer purposes is a fact that is peculiarly within Equifax's knowledge and the record fails to show that WNS either knew or should have known of that fact.

■ Plaintiffs argue that WNS must have known that the Special Service Reports were "consumer reports" because they were "laden" with "consumer information." The FCRA does not, however, regulate all information on consumers. It regulates information that is "used or expected to be used or collected" for one of the "consumer purposes" set forth in the definition of a "consumer report." Admit-tedly, the statute might make more sense and would certainly be easier to apply if the term "consumer report" was defined in terms of a communication of what might generally be considered "consumer information." But that is not how the statute reads or how Congress intended the statute to read.

■ In a related vein, plaintiffs appear to argue that WNS must have known that the reports on plaintiffs were "consumer reports" because the reports stated that they contained information from Equifax's files. Again, this is simply insufficient to show that WNS knew or should have known that the information was originally collected for one of the purposes set out in the definition of a consumer report. *See Houghton*, 795 F.2d at 1148–49 (request for "general financial information" from Equifax in connection with investigative reports held not to be a request for an "investigative consumer report" and the fact that the requested report stated that "available credit files" were checked not sufficient to alert defendant that reports were "investigative consumer reports"); *cf. Heath*, 618 F.2d at 697 (in remanding case for determination of consumer reporting agency's liability, court states that "[c]rucial to this [issue] will be an *examination of the bureau's purpose when it collected the information*, and what it knew and expected concerning the use of the information supplied to" the persons who requested the reports). (Emphasis added.) Equifax is in the business of supplying information for both consumer and non-consumer purposes. WNS entered into a continuing relationship with Equifax to receive Special Service Reports to evaluate prospective franchisees. Because WNS intended to use the reports for business purposes, they could only be considered "consumer reports" if Equifax collected the information contained in the reports for consumer purposes or expected it to be used for such purposes. Equifax, the party who collected the information, however, advised WNS that the FCRA applied to the Personnel Reports, not the Special Service Reports. Thus, when WNS ordered the Spe-

cial Service Reports on plaintiffs for the purpose of investigating them in connection with the litigation between DTW and WNS, a purpose the parties agree does not constitute a "consumer" purpose set forth in the definition of "consumer report," WNS had no reason to believe that it was ordering a "consumer report" on plaintiffs. Moreover, the fact that the members of WNS's legal department may not have examined WNS's relationship with Equifax or the FCRA's requirements does not alter this conclusion. Any such examination would have turned up these same facts indicating that WNS did not have to concern itself with the requirements of the FCRA when ordering the Special Service Reports for a non-consumer purpose.

In short, even if the reports were "consumer reports" because Equifax may have originally collected or expected information in the report to be used for "consumer purposes," WNS cannot be held liable for requesting consumer reports. The purpose for which the Special Service Reports on plaintiffs were requested and the purposes for which WNS received reports in the past were both non-consumer purposes. The mere fact that the reports contained what might commonly be regarded as consumer information is simply insufficient evidence to impose liability upon WNS for negligently violating the FCRA. Accordingly, the judgment against WNS must be reversed.

### III.

### PLAINTIFFS' CROSS–APPEAL

Plaintiffs claim in their cross-appeal that they are entitled to a new trial against Equifax because the district court abused its discretion by denying them leave to amend their complaint to assert a claim under 15 U.S.C. § 1681e(a) against Equifax. Plaintiffs sought to amend their complaint to proceed against Equifax for its alleged failure to comply with the provisions of § 1681e(a), which requires a consumer reporting agency to maintain reasonable procedures designed to limit the furnishing of consumer reports "to the purposes listed under" 15 U.S.C. § 1681b and to establish procedures which "require that

prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." The first time Equifax became aware of plaintiffs' desire to pursue a § 1681e(a) theory against it was during the afternoon of Thursday, August 14, 1986. On that day, Equifax received a proposed jury instruction from plaintiffs setting forth the circumstances under which Equifax could be held liable for violating § 1681e(a). No prior pleading of plaintiffs had mentioned § 1681e(a) and the trial was scheduled to commence on Monday, August 18, 1986.

At the beginning of trial, Equifax immediately presented the district court with a motion *in limine* to exclude any evidence plaintiffs might present to establish a § 1681e(a) violation. Equifax claimed that plaintiffs' last-minute attempt to pursue a § 1681e(a) claim against it greatly expanded the scope of its defense without giving it time to prepare. Only at that point did plaintiffs move to amend their complaint. According to plaintiffs, they were entitled to amend their complaint because they were not aware of any facts indicating that Equifax violated § 1681e(a) until July 16, 1986, when they deposed Amelia Specht, an Equifax employee who had prepared some of the Special Service Reports on plaintiffs. It was not until then, plaintiffs contended, that they were aware that Specht did not ask customers the purposes for which they sought to use the reports she prepared. The district court granted Equifax's motion *in limine* and denied plaintiffs' motion to amend their complaint.

The decision whether to grant a motion to amend a complaint under Rule 15(a) rests within the district court's sound discretion. *Textor v. Board of Regents*, 711 F.2d 1387, 1391 (7th Cir.1983). There is no abuse of that discretion when granting leave to amend a complaint will unduly prejudice a party, such as when the party is not given sufficient opportunity to respond to the newly-raised issues. *See Feldman*

*v. Allegheny International, Inc.,* 850 F.2d 1217, 1225–26 (7th Cir.1988).

 Here, the district court did not abuse its discretion by denying plaintiffs' last-minute attempt to amend their complaint. Up until the afternoon of August 14, 1984, the only claim that Equifax was reasonably expected to respond to at trial was the claim that it violated § 1681b. As such, Equifax's defense was essentially limited to the issues of whether the Special Service Reports were "consumer reports" and, if so, whether Equifax furnished the reports to WNS without having reason to believe that WNS intended to use them for a permissible purpose. These issues focused only upon Equifax's relationship with WNS and the circumstances surrounding the preparation of the Special Service Reports on plaintiffs. By seeking to assert a § 1681e(a) claim against Equifax at the last minute, plaintiffs attempted to expand greatly the scope of the issues to be tried. To respond to these issues, the scope of Equifax's defense would have had to have expanded to address the reasonableness of its company-wide procedures as well as to address whether agreements and discussions with WNS satisfied any requirement imposed by § 1681e(a).[12]

In arguing that the district court abused its discretion, plaintiffs rely primarily upon their contention that they did not learn of the facts indicating that Equifax violated § 1681e(a) until one month before trial. In most cases, merely waiting a month after allegedly discovering new facts before moving to amend would certainly not be grounds for denying leave to amend a complaint. But here the month was the month immediately preceding the trial. As Equifax points out, its objection to plaintiffs' last-minute attempt to amend their complaint was not based on the relatively short time period between the deposition of Amelia Specht and the trial. Rather, it was based on the fact that plaintiffs waited until immediately before the trial itself to attempt to slip a § 1681e(a) claim into the case. Plaintiffs seek to have us empathize with the fact that they only had one month to move to amend their complaint. However, any such motion would have been a simple task requiring a minimal amount of legal research and drafting. At the same time, they seek to have us ignore the fact that they essentially sought to give Equifax one business day to investigate the facts, locate appropriate witnesses, ensure their availability to testify, locate and review any relevant documents, prepare the witnesses and documents for trial, develop a defense, research the relevant legal issues, and develop possible arguments in support of or in response to directed verdict motions or tendered jury instructions. To take advantage of the liberal amendment policies of Rule 15(a), a party must work within the spirit of that rule's amendment provisions. As soon as they learned of any facts that would have warranted their injecting a new legal theory into the case, plaintiffs should have acted promptly to give Equifax reasonable time to respond

---

12. In their reply brief, plaintiffs assert that their attempt to amend their complaint to charge Equifax with violating § 1681e(a) was not so much to assert a new theory of liability against Equifax but rather to be able to set forth the standards of conduct necessary to show that Equifax negligently violated § 1681b. This is a new twist to plaintiffs' appeal that they raised for the first time in their reply brief. Arguments that are raised for the first time in a reply brief are waived. *See Commonwealth Edison Co. v. Nuclear Regulatory Comm'n,* 830 F.2d 610, 621 n. 7 (7th Cir.1987) (arguments cannot be raised for the first time in a reply brief). In any event, even if properly raised before us, plaintiffs' argument would not alter our decision. Although § 1681b and § 1681e(a) are closely related, they each impose separate requirements upon consumer reporting agencies.

Moreover, we note that plaintiffs suffered little, if any, prejudice as a result of the district court's ruling. Plaintiffs were allowed to argue to the jury that Equifax negligently gave a consumer report to WNS for a non-consumer purpose. Plaintiffs' primary problem with regard to holding Equifax liable was that their theory of the case against WNS was perhaps Equifax's best defense. By arguing that business reports were consumer reports as a matter of law and that WNS allegedly "certified" that it would only request consumer reports, plaintiffs essentially were left with the argument that Equifax was negligent because it did not ask WNS why each and every report was requested even though Equifax discussed the FCRA with WNS and WNS allegedly "certified" that the reports would only be used for "consumer purposes." The jury obviously did not agree.

to that new theory. Plaintiffs did not do so. Rather, they waited until the last possible minute before giving Equifax any notice whatsoever. In these circumstances, the district court did not abuse its discretion.

Plaintiffs also claim that the district court abused its discretion by denying plaintiffs leave to amend their complaint to conform to the evidence presented at trial. At trial, Amelia Specht testified to the procedures she generally follows in preparing Special Service Reports. Specht testified that she does not ask customers the purpose for which the reports are being requested and that the purpose for which a report is requested does not affect the way in which she prepares a report. This testimony was introduced by plaintiffs without objection by Equifax. According to plaintiffs, Equifax's failure to object to this testimony constituted an implied consent to the trial of plaintiffs' § 1681e(a) claim.

Under Rule 15(b), a party is entitled to have his pleadings amended to conform to the evidence presented at trial if such issues are tried by the express or implied consent of the parties. The decision as to whether the issue which is the subject of the tendered amendment was actually tried by the express or implied consent of the parties, however, rests within the district court's discretion. *Sunstream Jet Express, Inc. v. International Air Service Co., Inc.*, 734 F.2d 1258, 1272 (7th Cir. 1984); *see also* 6 Wright & Miller, *Federal Practice & Procedure* § 1493 (1971).

■■■ "[A] court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim." *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir.1986); *see also Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053 (2d Cir.); *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Here, Amelia Specht's testimony concerning how she prepares the Special Service Reports was entirely relevant to plaintiffs' § 1681b claim. To establish the circumstances surrounding preparation of the Special Service Reports

on plaintiffs, plaintiffs were entitled to show the general procedures by which she prepares all Special Service Reports. Fed. R.Evid. 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Thus, Equifax's failure to object to this evidence that was relevant to plaintiffs' § 1681b claim cannot be viewed as an express or implied consent of the case under a § 1681e(a) theory. This is particularly so given that Equifax vigorously objected at the beginning of the trial to plaintiffs' attempt to pursue that claim against it. Accordingly, the district court's determination that plaintiffs' § 1681e(a) claim was not tried by the consent of the parties was not an abuse of discretion.

### IV.

### CONCLUSION

We reverse the district court's judgment against WNS and affirm the district court's decision denying plaintiffs a new trial against Equifax.

AFFIRMED IN PART, REVERSED IN PART.

REYNOLDS, Senior District Judge, concurring.

I concur in the result reached by the majority. The Fair Credit Reporting Act ("Act") was designed to protect the rights of consumers when engaged in consumer-related transactions such as transactions concerning an individual's eligibility for credit, insurance or employment. The plaintiffs and WNS were not engaged, and did not expect to be engaged, in a consumer-related transaction. Therefore, the plaintiffs are outside the scope of the act.

The phrase "consumer report" must be read so as to give the Act as a whole a rational construction. The type of transaction for which the information was in fact

used or collected should determine whether the report is a consumer report. Thus, a subject whose business transactions were not consumer-related is not protected by the Act.

In this case, the plaintiffs and WNS agree as a fact that information in the report was collected for and was expected to be used for litigation, which was not a consumer purpose under the Act. Therefore, the report was not a "consumer report." It is irrelevant what the reporting agency expected the report to be used for. Because the plaintiffs were not engaged in a consumer-related transaction with WNS, the plaintiffs are outside the scope of the Act and may not use the Act to recover damages against WNS.