Roger D. HOVATER, Plaintiff-Appellee,
Cross-Appellant,

v.

EQUIFAX, INC., Equifax Services, Inc.,
and Equifax Services, Ltd.,
Defendants-Appellants, Cross-Appellees.

No. 86–7419.

United States Court of Appeals,
Eleventh Circuit.

July 30, 1987.

James C. Barton, Johnston, Barton, Proctor, Swedlaw & Naff, J. William Rose, Jr., Birmingham, Ala., W. Rhett Tanner, Hansell & Post, David J. Bailey, Atlanta, Ga., for defendants-appellants, cross-appellees.

Ralph M. Young, Gonce, Young, Howard & Westbrook, Mary Anne Westbrook, Florence, Ala., for plaintiff-appellee, cross-appellant.

Before HATCHETT and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

## I.

This case comes before the Court on cross appeals. Equifax Services, Inc. (Equifax) appeals from a jury verdict and awards of compensatory and punitive damages for defamation and for violations of

the Fair Credit Reporting Act, (FCRA), 15 U.S.C. § 1681 *et seq.* Concurrently, Roger Hovater (Hovater) appeals from the district court's grant of summary judgment for Equifax on his civil RICO claims. 18 U.S.C. §§ 1961–68. As we find that Hovater's state law claims for libel and slander were time barred and that the FCRA does not apply in this case, we reverse the decision of the district court and remand this case for entry of a judgment for Equifax. The district court's summary judgment order on the RICO claims is affirmed.

## II. FACTS

At the center of this controversy is a report on an investigation about Hovater that Equifax prepared and provided to Pennsylvania National Mutual Casualty Insurance Co. (Penn National), a non-party, and certain others. The circumstances surrounding the preparation and dissemination of this report are as follows.

On September 1, 1982, the old Hovater homeplace, located in Colbert County, Alabama, was destroyed by fire. At the time, the Hovater family resided elsewhere. It is undisputed that arson caused the blaze. After the fire, Hovater filed a proof of loss with his insurer, Penn National. In light of the circumstances, Penn National's attorney, Braxton Ashe, sought to obtain background information about Hovater for use in evaluating the claim. Towards that end, Penn National hired Equifax.

Equifax assigned the task of investigating Hovater to Greg Rowe, a claims investigator in its Huntsville, Alabama, office. Mr. Rowe performed his investigation on November 15 and 16, 1982. Rowe conveyed the results of the investigation orally to Braxton Ashe, Penn National's attorney, and to the Colbert County Sheriff's Department. Rowe also summarized his results in writing in a report dated November 18, 1982 and sent copies to: 1) Braxton Ashe, Penn National's Attorney; 2) James Goad, Penn National's Claims Manager; 3) Richard Romard, Equifax's Fire Investigation Supervisor in Atlanta; and 4) the Colbert County Sheriff's Department. Rowe's report accused Hovater, *inter alia,* of associating with known arsonists and of having accumulated large gambling debts.

Upon reviewing the report on November 23, 1982, in Equifax's Atlanta office, supervisor Romard recognized that the report was extremely shoddy and that its dissemination to the authorities violated company policy. Romard concluded that the copies of the report should be retrieved and destroyed and that a revised report should be provided only to Penn National. The report was retrieved and revised and the new report was sent to Penn National.

On December 22, 1982, Penn National contested Hovater's fire insurance claim by filing suit for declaratory relief to determine its liability under the policy. Penn National alleged arson and misrepresentation in terms of the contents of the house, its lien holders, and its occupancy, as grounds for not paying Hovater on the policy. While Penn National initiated the suit, it was less than cooperative in complying with Hovater's requests for discovery or with the court's orders compelling the production of evidence. Ultimately, on January 18, 1985, Penn National did produce a number of documents including a copy of Equifax's initial 1982 report. It seems that while Penn National had returned the original report to Equifax as requested, it had retained a copy in its files. On February 4, 1985, Penn National settled its dispute with Hovater for $129,-000.

On February 19, 1985, Hovater requested Equifax's Florence, Alabama, office to disclose to him any information it had about him. Hovater was referred to the Birmingham office where upon initial investigation his file was not located. It appears that his file had been transferred to Atlanta when the 1982 report was revised and reissued. Equifax informed Hovater that it would be back in touch with him but before it did so Hovater filed suit. This Hovater did on March 1, 1985, less than two weeks after he first contacted the agency. Pursuant to discovery, by mid-April of 1985, Equifax provided Hovater with a copy of the initial 1982 report. Equifax had also retained a copy of the

report which it placed in investigator Rowe's personnel file.

Hovater sued Equifax for its preparation and dissemination of the 1982 report under various legal theories. The portions of Hovater's complaint which are pertinent to this appeal include his claims for libel and slander under Alabama law, violations of the Fair Credit Reporting Act, and civil RICO. The trial judge let the claims for defamation and violation of the FCRA go to the jury, which found for Hovater, but granted summary judgment for Equifax on the claims for civil RICO. Both parties have appealed.

## III. DEFAMATION

Equifax argues that Hovater's claims for libel and slander were barred by the applicable statute of limitations. It is uncontested that the applicable limitation period was one year. Ala.Code § 6–2–39(a)(4) (1975); *see, e.g., Holdbrooks v. Central Bank of Alabama, N.A.,* 435 So.2d 1250, 1251 (1983). Further, it is uncontested that Hovater did not file suit until more than two years from the date of publication of the alleged defamation, the event giving rise to a cause of action under Alabama law and causing the statute to commence running. The district court held that the limitations period had tolled until Hovater discovered the existence of his cause of action. Accordingly, the court held that Hovater's action was not time barred.

The basis for the district court's decision that the limitations period had tolled is Ala.Code § 6–2–3 (1975). On its face, this statute provides for the tolling of the limitations period in actions involving fraud until such time as the aggrieved party discovers or should have discovered the cause of action. Significantly, the Alabama courts have construed the tolling provision of § 6–2–3 to apply not only to causes of action for fraud but also to the concealment of the existence of other types of causes of action where a party has a duty to disclose the information upon which the cause of action is based because of the existence of a confidential relationship between the parties or due to the presence of

some special circumstance. *Holdbrooks,* 435 So.2d at 1251; *Tonsmeire v. Tonsmeire,* 285 Ala. 454, 233 So.2d 465, 468 (1970); Ala.Code § 6–5–102 (1975). The district court found that the statute had tolled in this case. On the basis of Alabama law, however, we must disagree. Under the applicable precedents no confidential relationship or special circumstances existed which required Equifax or Penn National to divulge the existence of a potential cause of action for defamation to Hovater. As there was no requirement of disclosure, no grounds for tolling the statute was present.

The Alabama Supreme Court's decision in *Tonsmeire,* 233 So.2d 465 (1970), is illustrative. A wife sued her estranged husband for libel. The suit was dismissed because she filed it more than a year after the date the alleged libel was published. She appealed on the ground that the limitation period was tolled due to the parties' confidential relationship as husband and wife. The Alabama Supreme Court held that while the parties were still legally married at the time of the publication of the alleged libel, the deterioration of their marriage and its impending dissolution ended its status as a confidential relationship. *Id.* at 467. The court then stated that:

> In the absence of a confidential relationship, we know of no duty imposed by law obligating an alleged tort feasor to make known to one possibly injured by his acts the existence of a possible cause of action. Nor was there any duty on the part of those to whom the libel was published to inform the plaintiff of the alleged libel.

> Since no duty to inform the plaintiff was cast either upon the defendant or those to whom he allegedly published the libel, plaintiff's reason for delay in filing her suit in reality resulted from ignorance of her alleged cause of action.

*Id.* at 468. The court noted that ignorance of a cause of action does not typically toll the limitations period for to do so would be to undermine the valuable policy consideration behind such statutes.

*Tonsmeire* is frequently cited for the proposition that absent a confidential relationship no duty to disclose a potential cause of action for defamation arises. Cases decided on the basis of *Tonsmeire* elaborate this concept as well as provide illustrations as to what are confidential relationships under Alabama law. *Holdbrooks v. Central Bank of Alabama, N.A., supra,* is such a case.

In *Holdbrooks,* the Alabama Supreme Court held that a bank did not have a duty to inform a guarantor of an allegedly libelous statement it made about the guarantor in a report to a credit agency. The court held that the parties did not occupy the type of confidential relationship requiring disclosure, especially in light of the bank's expressed intent to foreclose on the loan. *Id.,* 435 So.2d at 1252. Similarly, in *Clay v. Equifax,* 762 F.2d 952, 961 (11th Cir.1985), this Court held on the basis of Alabama law that an insurance company was not required to disclose to an insured allegedly libelous statements contained in a report the insurer received from Equifax.

Although we recognize that insurers owe a duty of good faith to their insureds, we do not believe that duty is equivalent to the confidential relationship envisioned by the Alabama courts [so as to require the insurance company to divulge a potential cause of action for defamation to an insured].

*Id.* at 961. Accordingly, the *Clay* court held that disclosure was not required.

Thus, in *Tonsmeire,* neither a husband nor the persons he made the allegedly defamatory statements to were required to disclose the event to the man's estranged wife. In *Holdbrooks,* a bank was not required to inform a guarantor that it may have made libelous statements about him to a credit agency. Furthermore, we read the court's silence on the issue in *Holdbrooks* to also mean that the credit agency was not required to disclose the bank's statements to the guarantor. Lastly, in *Clay,* this Court held that an insurance company was not required to divulge to its insured an allegedly libelous statement in a report it received from Equifax for use in evaluating a claim for benefits. Furthermore, the *Clay* court impliedly determined that Equifax was not required to divulge its statements to the insured.

██ On the basis of Alabama law, as illustrated by the preceding cases, we hold that no confidential relationship existed between Hovater and either Equifax or Penn National requiring either of the latter entities to divulge the existence of a potential cause of action for defamation to Hovater. In the absence of such a confidential relationship, there was no grounds for tolling the statute.

Furthermore, we hold that no "particular circumstances" existed under the facts of this case as an alternate ground upon which to toll the statute. *See* Ala.Code § 6–5–102 (1975). While the district court found otherwise, our holding, *see infra,* part IV, that the Fair Credit Reporting Act does not apply in this case removes from consideration the FCRA's notice and disclosure provisions as circumstances upon which to base a tolling of the statute. Absent a confidential relationship or particular circumstances upon which to base a tolling Hovater's claims for defamation were time barred and the district court erred in ruling otherwise.

### IV. FRCA

The district court found that Equifax's 1982 report to Penn National was a "consumer report" governed by the Fair Credit Reporting Act. 15 U.S.C. § 1681. In accordance with this finding, the jury awarded Hovater damages for Equifax's negligent noncompliance with the Act. 15 U.S.C. § 1681o. As we hold that the 1982 report was not covered by the FCRA, we find that the question of compliance was improperly before the jury. The district court's decision on this issue is reversed and the case is remanded for entry of a judgment for Equifax on this issue as well.

In 1970, Congress passed the Fair Credit Reporting Act. 15 U.S.C. § 1681 *et seq.* Recognizing the necessity of credit reporting agencies in our modern economy, Congress sought through the FCRA to curb some of the abuses inherent in the indus-

try.[1] To that end, Congress enacted the FCRA which seeks to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner. *See* 15 U.S.C. § 1681(b).

The FCRA focuses on the rights of consumers by regulating the practices of credit agencies and the recipients of their reports. 15 U.S.C. § 1681. Typically, the Act's safeguards are invoked when a consumer applies for credit, insurance or employment. 15 U.S.C. § 1681(a). In many instances, the Act requires an entity dealing with a consumer under one of the above-mentioned circumstances to disclose to the consumer that the party is going to make an investigation or procure information from a credit reporting agency about the consumer for use in considering the individual's application. 15 U.S.C. § 1681d. Significantly, the Act requires that whenever credit, insurance, or employment is denied a consumer or an adverse decision is made concerning a consumer's existing status on the basis of information contained in a credit report, the party that relies on the report must inform the consumer that the denial of his application, or the adverse action, resulted in whole or in part from the information contained in the report. The party relying on the report must also supply the consumer with the name and address of the reporting agency that provided the information. 15 U.S.C. § 1681n. Upon request and identification, the reporting agency is required to divulge the information in its files concerning the interested consumer. 15 U.S.C. § 1681g. If a consumer reasonably disputes the completeness or accuracy of the information contained in his or her file, the consumer may communicate this disagreement to the reporting agency thereby invoking the agency's statutory duty to reinvestigate. 15 U.S.C. § 1681i. If such an investigation fails to resolve the dispute, the consumer may file a statement contesting the information which is incorporated into the consumer's file. *Id.* In addition to the afore-

mentioned safeguard, the Act protects the consumer generally by requiring that obsolete information not be included in consumer reports, § 1681c, that reporting agencies follow reasonable procedures intended to assure the maximum possible accuracy of the information contained in reports, § 1681e, and that the confidentiality of the information be maintained by limiting the parties with access to reports to those with a legitimate interest in obtaining the information. § 1681b. Finally, to assure enforcement, the Act provides for both penal and civil remedies, including attorney's fees, for various forms of noncompliance. §§ 1681n, 1681p, 1681q.

While oversimplified, the foregoing description of the FCRA sets the stage for the narrow issue that this Court is faced with today. Generally stated, that issue is whether the FCRA governs information given by a consumer reporting agency to an insurance company for the insurer's use in considering an insured's claim for benefits under an existing policy. Stated more specifically and in light of the fact that the FCRA expressly regulates "consumer reports", the question may be phrased as whether Equifax's 1982 report to Penn National was a "consumer report" governed by the FCRA. On the basis of the express language of the FCRA, the Congress' intent as drawn from the Act's legislative history, and the weight of existing authority on the issue, we hold that a report which an insurer procures from a credit reporting agency solely for use in evaluating an insured's claim for benefits under an existing policy is not a "consumer report" subject to the regulatory provision of the FCRA.

### A. *Statutory Language*

■ As indicated, the provisions of the FCRA govern "consumer reports" and also "investigative consumer reports." Reports that do not fall within either of these definitional categories are outside the coverage of the Act. Under the statute:

---

**1.** For a concise history of the FCRA, *see* McNamara, *The Fair Credit Reporting Act: A Legisla-* *tive Overview,* 22 Emory J.Pub.L. 67 (1973).

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title.

§ 1681a(d). Summarized, the preceding section describes a "consumer report" as information from a credit reporting agency about a consumer for use in making eligibility determinations about credit, insurance, or employment. Section 1681b seems to add licensing and certain other governmental benefits to the list of eligibility determinations covered by the Act. § 1681b(3)(D). In addition, § 1681b limits the dissemination of consumer reports. Section 1681b reads:

### § 1681b. Permissible purposes of consumer reports

A consumer reporting agency may furnish a consumer report under the following circumstances and no other:

(1) In response to the order of a court having jurisdiction to issue such an order.

(2) In accordance with the written instructions of the consumer to whom it relates.

(3) To a person which it has reason to believe—

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B) intends to use the information for employment purposes; or

(C) intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

(E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

In conjunction §§ 1681a and 1681b provide the definition of a "consumer report." An "investigative consumer report," which is merely a special breed of "consumer report", is wholly defined by § 1681a(e). That section provides:

The term "investigative consumer report" means a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information.

■ Considering the Act's definitional sections, it is clear that a transference of information by a credit reporting agency to an insurance company for the sole intended purpose of evaluating a claim for insurance benefits under an existing policy is not a "consumer report" nor an "investigative consumer report" under the Act. In terms of the insurance industry, § 1681a speaks of a consumer report as a "communication of any information by a consumer reporting agency ... which is used ... in establishing the consumer's *eligibility* for ... insurance...." § 1681a(d) (emphasis added). Section 1681b(3)(C) describes the consumer report "in connection with the *underwriting* of insurance." (emphasis added). The language in these sections refers unequivocally to the inception and maintenance of the insurance contract. The phrases speak in terms of information con-

cerning a consumer's ability to get and keep insurance, they do not relate to information that is collected or transferred for the purpose of evaluating an insured's claim for benefits under an existing policy. The express language of the Act does not reach reports for the purpose of evaluating claims for benefits, accordingly, we hold that such reports are not governed by the FCRA.

While the express language of the Act does not include insurance claims reports, the argument is made that such reports fall under the Act's catch-all provision. Section 1681b(3)(E), the Act's final, comprehensive enumeration of the permissible circumstances for the dissemination of consumer reports provides that in addition to the court, a consumer, and persons who intend to use reports for purposes of credit, employment, the underwriting of insurance, or licensing, a report may be provided to a person who a credit agency has reason to believe "otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer." The argument goes that insurance claims reports fall within this provision.

Courts addressing this argument have tackled the perceived overinclusiveness of Section 1681b(3)(E) in a predictable manner. Canons of Statutory Construction have been invoked to resolve the conflict. Typically, the courts have recognized the preeminence of § 1681a and conformed the breadth of § 1681b to its bounds. Examples include *Cochran v. Metropolitan Life Ins. Co.,* 472 F.Supp. 827 (N.D.Ga.1979), where the court relied on the canon which seeks to preserve the substance and effect of all sections of an enactment in finding that § 1681a controls the breadth of § 1681b(3)(E). "Not to do this would render unnecessarily meaningless the § 1681a restrictive language ..." while "[c]onforming § 1681b to 1681a preserves the integrity of both sections, while promoting the underlying purpose of the entire subchapter." *Id.* 831. In *Houghton v. New Jersey Mfrs. Ins. Co.,* 795 F.2d 1144 (3rd Cir.1986), the Third Circuit agreed with *Cochran,* but also relied alternatively on the rule of *ejus-*

*dem generis*—when general words follow an enumeration of specific terms the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words—in limiting § 1681b(3)(E). *Id.* at 1150. And in *Fernandez v. Retail Credit Company,* 349 F.Supp. 652 (E.D.La.1972), in deciding a related issue, the court found that Section 1681a was the Act's "primary" definitional section while Section 1681b was only supplementary in that it served the purpose of helping to interpret the former section. *Id.* at 654. In sum, Section 1681b(3)(E) has not been given an expansive interpretation. On the other hand, thoughtful reasons against giving Section 1681b(3)(E) too narrow an interpretation have also been articulated. *See Houghton, supra,* at 1150 (Sloviter, J. concurring).

Whatever the proper interpretation of Section 1681b(3)(E), we hold that that provision does not reach insurance claims reports. Congress expressly discussed insurance in both definitional sections of the Act. *See* §§ 1681a and 1681b. In so doing, Congress spoke in terms of information relating specifically to the inception and maintenance of the insurance contract. As Congress declined in its explicit treatment of the subject of insurance to regulate insurance claims reports, we decline the opportunity to do so by reading the catch-all provision of Section 1681b(3)(E) to effectuate that end.

**B.** *Legislative History*

The legislative history of the FCRA evidences Congress did not intend to regulate insurance claims reports. The lengthy transcripts of the Senate Subcommittee hearings on S. 823, 91st Cong., 1st Sess. (1969), which substantially became the Act, do not reflect any inclination to extend the statute's reach beyond reports prepared in connection with insurance applications. *See generally, Hearings Before the Subcommittee on Financial Institutions of the Comm. on Banking and Currency,* 91st Cong., 1st Sess. (1969). The same is true of the hearing transcripts of the House Subcommittee, which considered a

more protective bill. *See generally, Hearings on H.R. 16340 Before the Subcommittee on Consumer Affairs of the Comm. on Banking and Currency,* 91st Cog., 2d Sess. (1970).

That Congress envisioned the Act as having a limited reach is also made plain by events subsequent to the bill's enactment. During Senate Subcommittee hearings in 1973, Senator Proxmire, who authored the Senate Version of the FCRA, chaired the Senate Subcommittee considering it, and guided the legislation through the House-Senate conference, considered whether the Act should be broadened to include insurance claims reports. *See Hearings on S. 2360 Before the Subcommittee on Banking, Housing and Urban Affairs,* 93rd Cong., 1st Sess. 61–62 (1973). Two years later, Senator Proxmire proposed legislation which would have expanded the Act to cover "general investigative reports." *See* S. 1840, 94th Cong. 1st Sess., § 5(a) (1975). When that legislation failed, Senator Proxmire renewed his effort to expand the Act in 1979, seeking specifically to include insurance claim reports in the definition of "consumer reports." S. 1928, 96th Cong., 1st Sess. § 2(a) 1324–25 (1979). However, like the amendment proposed in 1975, the 1979 amendment never became law. The inference that springs from this chain of events is that Congress did not believe that insurance claims reports were governed by the FCRA. Congress' refusal to revise the law indicates that it was content with that interpretation of the Act.

The Federal Trade Commission ("FTC") was designated by Congress to enforce the Act. In 1971 the FTC issued a question and answer pamphlet addressing a number of issues that had arisen soon after the Act had taken effect. One of the questions was:

Are "CLAIMS REPORTS", "ADJUST-MENTS REPORTS" or other reports obtained by an insurer in connection with an insurance claim a consumer report?

The FTC's answer was:

No, not at the time obtained. A report on a consumer, obtained by an insurance company in connection with a claim against it, is not used to determine a consumer's "eligibility" for insurance (Section 603(d)(1)) [15 U.S.C. § 1681a(d)(1) ] or in connection with the "underwriting of insurance involving the consumer" (Section 604(3)(C)) (15 U.S.C. § 1681b(3)(E)). Further, such report is not obtained in connection with a "business transaction involving the consumer" (Section 604(3)(E)) [15 U.S.C. § 1681b(3)(E) ] at the time it is obtained. Accordingly, such a claims report is not a "consumer report."

"Compliance with the Fair Credit Reporting Act," 5 CONSUMER CRED.GUIDE (CCH) ¶ 11,307 at 59,828 (1977).

This FTC interpretation is significant in light of the fact that Congress, aware of the published rulings cited above, has not seen fit to amend the Act to cover what the FTC has said the Act excluded. In 1978, Congress revisited § 1681c, amending it in certain particulars. That Section restricts the sort of information a "consumer report" may contain. By re-enacting the FCRA without changing the relevant statutory definition of a "consumer report", even though the FTC had given it a restricted interpretation, Congress gave an indication that it approved the agency's position. " 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.' " *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982); *NLRB v. Gullet Gin Co.,* 340 U.S. 361, 366, 71 S.Ct. 337, 340, 95 L.Ed. 337 (1951) (By re-enacting provision without pertinent modification, Congress accepted enforcement agency's interpretation).

In light of the Act's legislative and subsequent history, we conclude that Congress did not intend for the Act to govern claims reports.

### C. *Existing Precedent*

The majority of courts that have addressed the issue have held that insurance

claims reports are not governed by the FCRA.

The leading case in the area is *Cochran v. Metropolitan Life Insurance Co.*, 472 F.Supp. 827 (N.D.Ga.1979). *Cochran* is a well reasoned and thorough opinion firmly supporting its conclusion that the FCRA does not reach insurance claim reports. *Cochran's* reasoning was recently adopted by the Third Circuit in *Houghton v. New Jersey Manufacturers Insurance Co.*, 795 F.2d 1144 (3rd Cir.1986). A lower court decision in accord with the *Cochran-Houghton* line of authority is *Kiblen v. Pickle*, 33 Wash.App. 387, 395, 653 P.2d 1338, 1342 (1982).

*Beresh v. Retail Credit Co.*, 358 F.Supp. 260 (C.D.Cal.1973), is apparently the sole authority for the proposition that insurance claims reports are governed by the FCRA. *Beresh* held that claims reports fall under the catch-all provision of Section 1681b(3)(E) of the Act, discussed *supra*. We find *Beresh* unpersuasive and choose instead to align ourselves with the *Cochran-Houghton* line of cases.

In following *Cochran,* a 1979 decision from a district court in this Circuit, we feel compelled to distinguish this Court's decision in *Clay v. Equifax,* 762 F.2d 952 (11th Cir.1985), discussed *supra.* In *Clay,* this Court was faced with somewhat identical claims as those arising in this case. Without mentioning *Cochran* or *Beresh,* the *Clay* Court apparently assumed, for the sake of argument, that the FCRA applies to insurance claims reports. The court's assumption that the Act applies may be inferred from the Court's reliance on the substantive portions of the Act to find that each of the plaintiff's claims lacked merit. We read *Clay* as having assumed, *arguendo,* that the FCRA applied to insurance claims reports. *Clay* did not address the underlying issue, however, because it believed that even if the Act applied the plaintiff was not entitled to relief. *Clay* did not discuss the merits of this issue but left for another day the underlying question of whether the FCRA applies to insurance claims reports. Distinguishing *Clay* in this manner and facing squarely the merits of this issue, we hold that insurance claims reports are not governed by the Act.

Finally and further in support of our holding, we recognize a host of cases, analogous to our decision today, which similarly refuse to expand the scope of the FCRA. *See Henry v. Forbes,* 433 F.Supp. 5 (D.Minn.1976) (lobbyist's request for information on adversary's aide is not a "consumer report"); *Ley v. Boron Oil Co.,* 419 F.Supp. 1240 (E.D.Pa.1976) (report to establish identity of attorney for potential litigants is not a "consumer report"); *Sizemore v. Bambi Leasing Corp.,* 360 F.Supp. 252, 254 n. 3 (N.D.Ga.1973), ("key man" insurance policy investigation serves business not personal purpose and is thus not a "consumer report"); *Peller v. Retail Credit Co.,* 359 F.Supp. 1235 (N.D.Ga.1973), *aff'd* 505 F.2d 733 (5th Cir.1974) (employee's lie detector test results are not part of a "consumer report"); *Porter v. Talbot Perkins Children's Services,* 355 F.Supp. 174 (S.D.N.Y.1973) (adoption agency report on prospective adoptive parents is not a "consumer report"); *Soto v. Industrial Commission,* 18 Ariz.App. 53, 500 P.2d 313 (1972) (report on workmen's compensation claimant's physical activities is not a "consumer report").

## V. CONCLUSION

Finding that Hovater's claims for defamation were time barred under Alabama law and that the FCRA does not apply in this case, we reverse the decision of the district court on these issues. As we find that Hovater's contentions for establishing violations of civil RICO are completely without merit, we affirm the district court's grant of summary judgment on that issue.

Accordingly, this case is REVERSED in part, AFFIRMED in part, and REMANDED for entry of a judgment for Equifax.