**ST. PAUL GUARDIAN INSURANCE COMPANY, Plaintiff–Counter Defendant–Appellee,**

v.

**Charles G. JOHNSON, Defendant–Counter Plaintiff–Appellant.**

No. 88–2529.

United States Court of Appeals, Fifth Circuit.

Oct. 6, 1989.

W. Troy McKinney, Stanley G. Schneider, Houston, Tex., for defendant-counter plaintiff-appellant.

Stephen Pate, Fulbright & Jaworski, Houston, Tex., for plaintiff-counter defendant-appellee.

Before CLARK, Chief Judge, JOHNSON and SMITH, Circuit Judges.

JOHNSON, Circuit Judge:

Defendant Charles Johnson appeals the district court's entry of a directed verdict in favor of the plaintiff on Johnson's counterclaim under the Fair Credit Reporting Act. For the reasons cited herein, we reverse and remand.

## I.  FACTS AND PROCEDURAL HISTORY

In 1986, the appellant, Charles Johnson, (hereinafter Johnson) filed a claim with St. Paul Guardian Insurance Company (hereinafter St. Paul) for losses incurred as a result of an alleged theft at Johnson's rural home near Hardin, Texas. During the course of St. Paul's investigation of the claim, St. Paul investigators visited Johnson's home and became suspicious of Johnson's claim. The investigators noted in particular that the large number of items reported as stolen by Johnson could not have been easily contained in Johnson's small house. Additionally, the investigators got the impression that Johnson did not live in the house. Acting on their suspicions, the investigators undertook a more comprehensive investigation to determine whether the house was indeed Johnson's residence, as required by St. Paul's policy, and whether Johnson owned the items that he had reported as stolen.

During the course of the ensuing investigation, St. Paul investigators sought and obtained a copy of Johnson's credit report for investigative purposes. Ostensibly, the credit report had been secured in order to determine whether the house was Johnson's primary residence, and whether Johnson owned the items reportedly stolen. Ultimately, after the St. Paul investigators completed their investigation, the company denied Johnson's claim.

St. Paul then filed an action in the United States District Court for the Eastern District of Texas seeking a declaratory judgment that St. Paul was not liable under the policy for Johnson's claim. Johnson counterclaimed alleging that St. Paul, during its investigation and denial of Johnson's claim, had violated provisions of the Fair Credit Reporting Act (FCRA), the Texas Deceptive Trade Practices Act (DTPA), and the Texas Insurance Code. The district court granted St. Paul's motion for a directed verdict against Johnson on the FCRA, DTPA and Texas Insurance Code claims. The jury returned a verdict in favor of St. Paul on Johnson's claim under the policy, finding that no theft had occurred. Thereafter, Johnson appealed the district court's directed verdict on Johnson's FCRA claim only.

## II.  DISCUSSION

### A.

█  As a threshold matter, St. Paul argues on appeal that because Johnson lacks "clean hands" he has no standing to pursue his FCRA claim on appeal. Because the foregoing argument essentially involves this Court's inherent equitable powers, we review St. Paul's contentions in this regard de novo.

█  St. Paul cites *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wash.2d 643, 757 P.2d 499 (1988) in support of its "clean hands" argument. In *Cox*, the Washington Supreme Court held that an insured who attempted to commit insurance fraud could

not recover under the Washington Consumer Protection Act for the insurance company's alleged bad faith in processing the claim. The *Cox* Court, in reaching that holding, concluded that the Washington Consumer Protection Act was designed to protect innocent consumers rather than aid and abet those who engage in the practice of insurance fraud.

In contrast, there is no indication in the instant case that the protection provisions of the FCRA are reserved for only those who have done no wrong. Unlike the Washington Consumer Protection Act in *Cox,* there is no danger that the FCRA will be a sword in the hands of the perpetrator of insurance fraud. Rather, the FCRA will only become a problem for an insurance company when the insurance company violates FCRA provisions.

■ As a matter of policy, St. Paul urges that if this Court were to allow Johnson to recover under the FCRA, we would be rewarding Johnson's fraudulent conduct in pursuing a bogus insurance claim. While we certainly agree with St. Paul that insurance companies, the courts and the public have an interest in preventing insurance fraud, we nevertheless are constrained to conclude that this interest does not give rise to blanket immunity for actions taken in contravention of the provisions of the FCRA by an insurance company during the course of its investigation of a claim. It seems clear that so long as an insurance company complies with the law during the course of its investigation of a fraudulent claim, the FCRA will not impede that investigation. Accordingly, we conclude that Johnson has standing to pursue his claims against St. Paul for alleged FCRA violations.

### B.

■ The FCRA was the product of Congressional concern over abuses in the credit reporting industry. The legislative history of the FCRA reveals that it was crafted to "protect an individual from inaccurate or arbitrary information ... in a consumer report ...," *Pinner v. Schmidt,* 805 F.2d 1258, 1261 (5th Cir.1986), *cert.*

*denied,* 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 766 (1987), and "to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Hovater v. Equifax, Inc.,* 823 F.2d 413, 417 (11th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987) (footnote omitted). The FCRA defines a consumer report as

> ... any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is *used* or expected to be used or collected in whole or in part for the *purpose* of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title.

15 U.S.C. § 1681a(d) (emphasis supplied).

In the instant case, St. Paul contends that because it did not "use" the information contained in Johnson's credit report for any of the enumerated purposes in § 1681a(d), the credit report was not a consumer report within the meaning of the FCRA. Thus, St. Paul contends that its conduct with regard to its use of Johnson's credit report during the course of the investigation of Johnson's claim was not governed by the strictures of the FCRA. Johnson, on the other hand, argues that it is the "purpose" for which the information contained in the credit report was collected rather than its ultimate "use" which should control whether it should be deemed a consumer report under the FCRA or not. Our resolution of these two divergent positions will necessarily decide whether, in the instant case, the credit report obtained by St. Paul was a "consumer report" under the FCRA, and if so, whether St. Paul was obligated to comply with the provisions of the FCRA.

In support of its argument that the "use" to which the information contained in

a credit report is put should be determinative of whether the report falls within the statutory definition of a consumer report, St. Paul relies on *Hovater v. Equifax, Inc.* In *Hovater*, the plaintiff Hovater filed a claim for reimbursement of losses sustained when the old Hovater family home was destroyed by fire. Hovater's insurance carrier, Penn National, suspecting that Hovater had set the fire himself, engaged the services of Equifax to conduct a background investigation of Hovater. Equifax thereafter prepared a report which revealed that Hovater was saddled with substantial gambling debts and frequently associated with known arsonists. Reversing the district court's judgment in favor of Hovater, the Court of Appeals concluded that "a report which an insurer procures from a credit reporting agency *solely for use* in evaluating an insured's claims ... is not a 'consumer report' [under] the FCRA." *Id.* 823 F.2d at 417 (emphasis supplied). St. Paul argues that the foregoing language compels the conclusion that a credit report used during an insurance company's investigation of a claim is not a "consumer report" under the FCRA. We are constrained to disagree.

*Hovater* is distinguishable from the instant case for the following reasons. In *Hovater*, the insurance company commissioned the generation of the credit report. At the insurance company's behest, Equifax collected and compiled the information on Hovater "solely for use" in evaluating Hovater's claim. In the instant case, however, the information contained in Johnson's credit report was not collected "solely for use" in evaluating Johnson's claim against St. Paul. Rather, the record indicates that St. Paul merely obtained a copy of a pre-existing credit report on Johnson containing information which had already been collected for purposes other than St. Paul's investigation of Johnson's claim. Although St. Paul did not ultimately use Johnson's credit report for one of the FCRA's enumerated purposes, the information in the report nevertheless was "collected in whole or in part" by a credit reporting agency for FCRA enumerated purposes.[1] Thus, under a plain reading of § 1681a(d), the report obtained by St. Paul is a "consumer report" to which the provisions of the FCRA apply.

St. Paul's reading of the FCRA also creates irreconcilable conflicts between its statutory provisions. One of the central purposes of the FCRA was to restrict the purposes for which consumer reports may be used, for the simple reason that such reports may contain sensitive information about consumers that can easily be misused.[2] To illustrate the untenable nature of St. Paul's construction of the FCRA in this context, suppose X secured Y's credit report for the sole purpose of disclosing it to embarrass Y. Under St. Paul's reasoning, focusing solely on X's "use" of the report, the report would not be a credit report under the FCRA and thus Y would not be afforded FCRA protections. Not only would this result run contrary to con-

---

1. In *Heath v. Credit Bureau of Sheridan, Inc.,* 618 F.2d 693 (10th Cir.1980), the Tenth Circuit held that

> a critical phrase in the definition of consumer report is the second requirement: the relevant information must be "used or expected to be used or collected in whole or in part for the purpose of serving as a factor" with regard to enumerated transactions. This phrase clearly requires judicial inquiry into the motives of the credit reporting agency, for only it "collects" the information. Similarly, the term "expected to be used" would seem to refer to what the reporting agency believed. Thus, if a credit bureau supplies information on a consumer that bears on personal financial status, but does not know the purpose for which the information is to be used, it may be reasonable to assume the agency expected the information to be used for a proper purpose. Similarly, if at the time the information was collected, the agency expected it to be used for proper purposes, a transmittal of that information would be a consumer report.

> *Id.* at 696 (citations omitted). *See also Hansen v. Morgan,* 582 F.2d 1214 (9th Cir.1978); *Kennedy v. Border City Sav. and Loan Ass'n,* 747 F.2d 367 (6th Cir.1984); *Yohay v. City of Alexandria Employees Credit Union,* 827 F.2d 967 (4th Cir.1987); *Rasor v. Retail Credit Co.,* 87 Wash.2d 516, 554 P.2d 1041 (1976) (quoting a FTC staff opinion supporting this interpretation).

2. Section 1681b mandates that a consumer reporting agency may furnish a consumer report only in certain enumerated circumstances. Furthermore, § 1681e(a) requires that [e]very consumer reporting agency shall maintain reasonable procedures designed ... to limit the furnishing of consumer reports to the purposes listed under § 1681b.

gressional intent, it would render meaningless FCRA section 1681b which allows for the release of credit reports only for certain purposes.

Under St. Paul's reasoning, credit reports would be releasable under all circumstances. If used for non-FCRA purposes, a credit report would be releasable because it did not fall with the FCRA definition of a consumer report. If used for FCRA purposes, a credit report would likewise be releasable because it would meet the definition of a consumer report. We simply cannot conclude that Congress intended such an illogical result. Accordingly, we reject St. Paul's argument that the definition of a "consumer report" under the FCRA depends on the use to which the information contained therein is put and conclude that the purpose for which the information was collected governs whether that report is a "consumer report" under the FCRA.[3] We therefore hold that St. Paul was bound to comply with FCRA provisions in the handling of Johnson's credit report. In so holding, we are constrained to reverse the district court's entry of a directed judgment in favor of St. Paul on Johnson's FCRA claim and remand this case for further proceedings.

### C.

In remanding, we note that the record reveals that Johnson failed to allege any specific violation of the FCRA by St. Paul. Since the FCRA provisions regarding the recipients of consumer reports are very narrow, it is incumbent on Johnson to nominate those provisions which he alleges that St. Paul violated. Additionally, we note that Johnson has not shown any damages flowing from St. Paul's alleged violations of FCRA provisions. Because St. Paul failed to raise these two points in its motion for directed verdict, however, we are precluded from considering them on appeal. *See Woods v. Sammisa Co.*, 873 F.2d 842, 852–53 n. 14 (5th Cir.1989).

Our remand does not preclude consideration by the district court of motions for directed verdict or for summary judgment on these or other grounds in light of future developments in that court.

### III. CONCLUSION

We conclude that Johnson has standing to pursue his FCRA claim against St. Paul. Further, having determined that the purpose for which the information contained in a credit report is collected (rather than its ultimate use) determines whether the report is a consumer report under the FCRA, we conclude that St. Paul was bound to comply with FCRA provisions in handling Johnson's credit report. Accordingly, the judgment of the district court granting a directed verdict in favor of St. Paul on Johnson's FCRA claim is reversed. This case is remanded for proceedings not inconsistent with this opinion.

**REVERSED AND REMANDED.**

---

**3.** To the extent that St. Paul relies on *Houghton v. New Jersey Mfrs. Ins. Co.*, 795 F.2d 1144 (3d Cir.1986) and *Cochran v. Metropolitan Life Ins. Co.*, 472 F.Supp. 827 (N.D.Ga.1979) to support its position, such reliance is misplaced. Both *Houghton* and *Metropolitan Life* are distinguishable from the instant appeal in that the reports at issue in those cases were prepared and transmitted specifically as insurance claims reports, not general credit reports. In each case, the insurance company asked a credit reporting agency to prepare a report relating to a specific insurance claim on a preexisting policy. Again we observe that both the text of § 1681a(d) of the FCRA—which speaks in terms of "eligibility" for insurance—and the legislative history of the FCRA make it clear that reports created and prepared for the specific purpose of the investigation of insurance claims are outside the FCRA.

We also note that the conclusion we reach today is in accord with the legislative purposes behind the FCRA. The FCRA was designed to ensure that, once a consumer reporting agency collected information on a person related to their credit eligibility, the information could only be released for certain purposes and in a certain manner. The focus of the FCRA is primarily upon the credit reporting agency, and the confidentiality and accuracy of the information collected. To focus only on the use of the information after it was collected in determining whether the Act applied would severely undermine the Act's ability to regulate the practices of the collector of the information, the consumer reporting agency.