[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

No. 97-8432

D.C. Docket No. 1:95-CV-3287-JOF

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
2/19/03
THOMAS  K. KAHN
CLERK

JAMES S. YANG and CLAIRE G. YANG,

Plaintiffs-Appellants,

versus

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 22, 1998)**

Before HATCHETT, Chief Judge, and RONEY and CLARK, Senior Circuit Judges.

HATCHETT, Chief Judge:

While investigating an insurance claim, the appellee, Government Employees Insurance

Company (GEICO), obtained information from a credit reporting agency regarding the

appellants, James and Claire Yang. The Yangs commenced the present lawsuit alleging that GEICO violated the Fair Credit Reporting Act (FCRA), 15 U.S.C.A. §§ 1681-1681u (West 1997 & Supp. 1998). The district court granted summary judgment in favor of GEICO, holding that GEICO's conduct was not subject to FCRA restrictions because the document GEICO obtained regarding the Yangs was not a "consumer report." We reverse.

## I. BACKGROUND

In November 1993, James Yang (Yang) was involved in a car accident with a woman insured under a GEICO insurance policy. The Yangs submitted a bodily injury and property damage claim to GEICO. Kathleen Smith, a claims adjuster, referred the Yangs' claim to GEICO's Special Investigations Unit (SIU). The SIU examines claims where insurance fraud is suspected, and other claims that require more detailed investigations into claimants' backgrounds.

Smith completed an SIU referral form on the Yangs' claim. This form included a section marked "REASON FOR REFERRAL," wherein Smith made the following comments regarding the need for SIU involvement: (1) Yang owned his own company and worked out of his home; (2) the Yangs had not been cooperative in settling the property damage claims; (3) Yang was unemployed, had no health insurance and claimed that he could not afford his medical expenses; (4) Yang was in the process of buying his own company; and (5) GEICO representatives had not been able to speak directly with Yang because Claire Yang had intercepted all of his telephone calls. These circumstances caused Smith to suspect that the Yangs' insurance claim may be fraudulent.

Based on Smith's observations, SIU Manager Jed George sought to verify Yang's address, employment and social security number. To this end, George obtained an "Inquiry

Activity Report" (IAR) on Yang through a local affiliate of Equifax Credit Information Services, Inc. (Equifax).[1]  To access Yang's IAR, an SIU clerk entered Yang's full name, current address and social security number into an SIU computer terminal that was linked to the local Equifax affiliate.  An Equifax computer received this request directly.  Then, without human intervention, the Equifax computer generated Yang's IAR and transmitted it back to GEICO.  This system is called "ACRO," which stands for Automated Credit Reporting On-line.  Subscribers receive the IARs directly from Equifax's data banks.  Equifax's local affiliates act as intermediaries, handling the billing procedures and answering service-related questions from subscribers.

IARs are preexisting, non-customized documents containing the subject's name, recent addresses, social security number, date of birth and recent employers.  IARs also contain a partially-encoded list of all the entities that have inquired about the subject's credit history for the previous two years, such as lending institutions and collection agencies.  For instance, any entity requesting either an IAR or a full credit report would appear on the inquiry activity list.  The purpose of each inquiry, however, cannot be discerned from the IAR on its face.  This information may only be obtained directly from the individual inquirers.  The Yangs offered evidence to suggest that substantial inquiry activity on an individual's report is a negative factor in evaluating the individual's credit risk, especially when the inquiring entities are collection agencies.

In addition to his name, social security number and date of birth, Yang's IAR indicated (1) the year that his social security number was issued; (2) the state that issued his social security

---

[1] Until GEICO prohibited the practice in 1994, the SIU regularly utilized IARs in evaluating insurance claims.

3

number; (3) his three most recent addresses; (4) his nickname; (5) the names of his three most recent employers, including his job titles for two of the three; and (6) Claire Yang's full name and two most recent employers, in addition to her most recent job title. Yang's IAR also indicated that five entities had inquired about his credit history within the two years prior to the date GEICO requested the IAR. From the industry codes assigned to each inquirer, GEICO could discern that four of the five inquirers were collection agencies.

In one of its internal reference guides, Equifax describes IARs as "report[s] that contain[] . . . the consumer's identification information and a listing of credit inquiries on their file . . . ." According to the guide, the pattern of activity on a subject's file can "help determine risk[.]" The guide also lists "[c]ollection agencies, personal finance companies, [and] financial institutions" as "potential prospects" for obtaining IARs. Finally, the guide cautions against improper use of IARs since, in Equifax's view, they contain information "placing [them] under the guidelines of the FCRA." An Equifax representative testified that the company would not knowingly allow a subscriber, such as GEICO, to obtain IARs to evaluate insurance claims because that is not one of the permissible uses of "consumer reports" under the FCRA.

In November 1995, the Yangs filed this lawsuit against Equifax, Inc. and GEICO in the Superior Court of Fulton County, Georgia, contending that GEICO's use of Yang's IAR violated the FCRA. Equifax, Inc. removed the case to the United States District Court for the Northern District of Georgia.[2] In May 1996, GEICO filed a motion for summary judgment. Relying upon

---

[2] In December 1995, the Yangs moved to join Equifax Credit Information Services, Inc., a subsidiary of Equifax, Inc., as an additional defendant in the action. In July 1996, however, the Yangs stipulated to the dismissal of both Equifax, Inc. and Equifax Credit Information Services, Inc.

this court's decision in <u>Hovater v. Equifax, Inc.</u>, the district court granted the motion, holding that Yang's IAR was not a "consumer report" subject to FCRA restrictions. <u>Hovater v. Equifax, Inc.</u>, 823 F.2d 413 (11th Cir.), <u>cert. denied</u>, 484 U.S. 977 (1987). This appeal followed.

## II. ISSUE

The question presented in this appeal is whether the district court properly concluded that Yang's IAR, which GEICO used for the sole purpose of evaluating his insurance claim, was not a "consumer report" within the meaning of the FCRA.[3]

## III. STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment <u>de</u> <u>novo</u>, applying the same legal standard that the district court employed in the first instance. <u>Hairston v. Gainesville Sun Publishing Co.</u>, 9 F.3d 913, 918-19 (11th Cir. 1993).

## IV. DISCUSSION

When Congress enacted the FCRA in 1970, it recognized the "vital role" that credit reporting agencies assume in our economic system. 15 U.S.C.A. § 1681(a)(3) (West 1997). The FCRA reflects Congress's concern with the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C.A. § 1681(a)(4). The FCRA seeks to promote the credit reporting industry's responsible dissemination of accurate and relevant information. <u>See</u> 15 U.S.C.A.

---

[3] The Yangs raise two additional issues on appeal. First, they challenge the district court's ruling that certain internal GEICO memoranda were protected from disclosure under the attorney-client privilege. Second, the Yangs contend that the district court erred in concluding that GEICO was not subject to liability for obtaining information from Equifax under false pretenses, in violation of 15 U.S.C. § 1681q. We find the Yangs' contentions as to both issues devoid of merit and affirm the district court's judgment without discussion. <u>See</u> 11th Cir. R. 36-1.

§ 1681(b). The FCRA also aims to maintain confidentiality of information that qualifies as a "consumer report." Accordingly, access to consumer reports is limited to parties having a legitimate interest in obtaining the information. See 15 U.S.C.A. § 1681b. The willful or negligent failure to comply with any of the FCRA's requirements may give rise to civil liability. See 15 U.S.C.A. §§ 1681n–1681p.

The Yangs contend that IARs are consumer reports and emphasize that insurance claims evaluation is not among the permissible purposes for procuring a consumer report under section 1681b. The Yangs therefore assert that GEICO's conduct ran afoul of the FCRA. They seek compensatory and punitive damages against GEICO, as well as attorney's fees.

We begin our analysis with the statutory definition of a "consumer report" under the FCRA. Our starting point is section 1681a. In pertinent part, that section provides as follows:

> The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for–
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
> (B) employment purposes; or
> (C) any other purpose authorized under section 1681b of this title.

15 U.S.C.A. § 1681a(d)(1). The foregoing definition indicates that a consumer report is made up of three fundamental elements. First, a "consumer reporting agency" must "communicat[e] . . . information[.]" Second, the "communication of information" must "bear[] on" any one of a list of factors. Third, the "communication of information" must be "used or expected to be used or

6

collected in whole or in part" for any one of several purposes. For ease of reference, we will refer to the language of the third element as the "Purpose clause."

Equifax is certainly a "consumer reporting agency" as the FCRA defines that term, and Equifax's transmission of IARs to its subscribers satisfies the first element of section 1681a(d)'s definition. We find that the second element is also met because the information contained in IARs "bears on" several (if not all) of the seven enumerated factors, such as an individual's "credit standing," "personal characteristics," and "mode of living." We deem the third element to be outcome-determinative in this case. Accordingly, we devote the remainder of the following analysis to the issue of whether IARs meet the requirements of the Purpose clause, so as to qualify as consumer reports under the FCRA.

Under the Purpose clause, the relevant "communication of information" is not a "consumer report" unless it is "used or expected to be used or collected" either (1) to "serv[e] as a factor in establishing the consumer's eligibility" for credit, insurance or employment; or (2) for "other purpose[s] authorized under section 1681b . . . . " 15 U.S.C.A. § 1681a(d)(1). To complete section 1681a(d)'s definition of a consumer report, we must therefore refer to section 1681b, entitled "Permissible purposes of consumer reports." Section 1681b(a) provides that "any consumer reporting agency may furnish a consumer report under the following circumstances and no other:"

> (1) In response to the order of a court . . . .
> (2) In accordance with the written instructions of the consumer to whom it relates.
> (3) To a person which it has reason to believe–
> > (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B) intends to use the information for employment purposes; or

(C) intends to use the information in connection with the underwriting of insurance involving the consumer;  or

(D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status;  or

(E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

(F) otherwise has a legitimate business need for the information–

(i) in connection with a business transaction that is initiated by the consumer;  or

(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

(4) In response to a request by the head of a State or local child support enforcement agency . . . .

(5) To an agency administering a State plan . . . for use to set an initial or modified child support award.

15 U.S.C.A. § 1681b(a).

Under the foregoing statutory scheme, section 1681b has two functions:  it adds to section 1681a(d)'s definition of a consumer report, as well as delineates the permissible uses for those "communications of information" already falling within the definition of a "consumer report."

We now turn to our application of the Purpose clause to the facts of this case and determine whether IARs are "used or expected to be used or collected in whole or in part" for any of the purposes described in sections 1681a(d) or 1681b.  We note that this clause incorporates three distinct concepts:  ultimate use, expectation of use, and reason for

compilation.[4]  Accordingly, in analyzing whether Yang's IAR qualifies as a consumer report under the third element of section 1681a(d)'s definition, we consider (1) whether GEICO ultimately "used" the IAR for one of the purposes listed; (2) whether Equifax "expected [IARs] to be used" for one of the purposes listed; and (3) whether Equifax "collected" the information contained in IARs for one of the purposes listed.

With respect to the first consideration, GEICO indisputably "used" Yang's IAR for the sole purpose of evaluating the Yangs' insurance claim.  Because this purpose is not listed in sections 1681a(d) or 1681b, Yang's IAR does not qualify as a consumer report when examining GEICO's ultimate use alone.  It makes no difference whether GEICO was actually interested in examining the pattern of inquiry activity on Yang's report, or whether it sought the report only to verify Yang's background information.

The Yangs argue that IARs are consumer reports, despite GEICO's ultimate use of the information, based on the second and third components of the Purpose clause.  The Yangs contend that Equifax "expected [IARs] to be used" for many of the specifically-enumerated purposes outlined in sections 1681a(d) and 1681b, especially those purposes related to credit eligibility determinations and the evaluation of individuals within the context of credit-related transactions.   The Yangs also contend that Equifax "collected" the information contained in IARs for the same specifically-enumerated reasons.  To support these contentions, the Yangs

_____

    [4] See Heath v. Credit Bureau of Sheridan, Inc., 618 F.2d 693, 696 (10th Cir. 1980) (expressly construing the Purpose clause as "requir[ing] judicial inquiry into" the motives of the user, "the motives of the credit reporting agency [that 'collects'] the information" and the "reporting agency['s] belie[fs]" with respect to how the information is 'expected to be used'"); see also Ippolito v. WNS, Inc., 864 F.2d 440, 449 n.10 (7th Cir. 1988) ("the plain language of [the Purpose clause] requires inquiry into the reasons why the report was requested and why the information contained in the report was [originally] collected or expected to be used by the consumer reporting agency"), cert. dismissed, 490 U.S. 1061 (1989).

point to Equifax's characterizations of IARs in its internal reference materials. Emphasizing the Purpose clause's repetitive use of the disjunctive "or," the Yangs contend that IARs are consumer reports if such a finding is consistent with any one of the clause's components – ultimate use, expectation of use, or reason for compilation. We agree.

The district court's reliance on this circuit's decision in Hovater v. Equifax, Inc. was misplaced. Hovater v. Equifax, Inc., 823 F.2d 413 (11th Cir.), cert. denied, 484 U.S. 977 (1987). After an arsonist set a fire destroying "the old Hovater homeplace," Roger Hovater filed a claim with his insurer, Pennsylvania National Mutual Casualty Insurance Company (Penn National). 823 F.2d at 414. Penn National hired Equifax Services, Inc. (Equifax Services) to obtain background information about Hovater for use in evaluating the claim. Greg Rowe, an Equifax Services claims investigator, prepared a report revealing that Hovater was saddled with substantial gambling debts and that he associated with known arsonists. Hovater sued Equifax Services, alleging that its preparation and dissemination of this report violated the FCRA. The district court found that Rowe's report was a "consumer report," and the jury awarded Hovater damages under 15 U.S.C. § 1681o for Equifax Services' negligent noncompliance with the FCRA. This court reversed and remanded for entry of judgment in favor of Equifax Services, finding that the question of compliance was improperly before the jury because the report at issue was not a "consumer report" under the FCRA. 823 F.2d at 416.

In Hovater, this court held that "a report which an insurer procures from a credit reporting agency solely for use in evaluating an insured's claim for benefits under an existing policy is not a 'consumer report' subject to the regulatory provision[s] of the FCRA." 823 F.2d at 417. Given the type of report at issue in Hovater, the court's decision was undoubtedly correct. The opinion exhaustively analyzed the FCRA's text and legislative history. In terms of

10

defining a consumer report within the context of the insurance industry, the court noted that a "'communication of . . . information'" is a consumer report if it is used either to "'establish[] the consumer's *eligibility* for . . . insurance[,]'" or "'in connection with the *underwriting* of insurance.'" 823 F.2d at 418 (quoting 15 U.S.C. §§ 1681a(d), 1681b(a)(3)(C)). The court observed that these "phrases speak in terms of information concerning a consumer's ability to get and keep insurance, they do not relate to information that is collected or transferred for the purpose of evaluating an insured's claim for benefits under an existing policy." 823 F.2d at 418-19. Moreover, the court rejected Hovater's argument that Rowe's report qualified as a consumer report because Penn National used it for an "otherwise . . . legitimate business [purpose,]" pursuant to the catch-all provision in section 1681b(a)(3)(F). The court held that this provision "does not reach insurance claims reports." 823 F.2d at 419.

Although <u>Hovater</u>'s language appears broad enough to encompass the present factual setting, it is materially distinguishable. In construing section 1681a(d)'s Purpose clause, the <u>Hovater</u> court had no cause to differentiate between ultimate use, expectation of use, and reason for compilation. Dissecting the analysis in this manner was unnecessary because the single purpose of evaluating Hovater's insurance claim was the reason Penn National ultimately used Rowe's report, the reason Rowe expected his report to be used, and the reason Rowe compiled his report. This case poses a different scenario. Generally, IARs are compiled, and expected to be used, for a different reason than GEICO's ultimate use of Yang's IAR. Equifax compiles the information contained in IARs for credit-related purposes, and expects IARs to be used for such purposes. GEICO, however, ultimately used Yang's IAR to evaluate the Yangs' insurance claim, a purpose inconsistent with Equifax's expectation of use and reason for compilation. The <u>Hovater</u> court was not confronted with this situation and thus collapsed the Purpose clause's

11

reference to "expectation of use" and "reason for compilation" into a single analysis based on "ultimate use."

Under Hovater, Yang's IAR could *not* be considered a consumer report under the "use" component of the Purpose clause. This ended the Hovater court's inquiry only because an analysis of the other two components would have made no difference in the outcome. The facts in this case, however, require us to also consider Equifax's "expectation of use" and "reason for compilation." Under the plain language of the FCRA, a "communication of information" is a "consumer report" if *any one of the three components* in the Purpose clause is met. Thus, Yang's IAR is a protected "consumer report" because Equifax compiled it for credit-related purposes and expected it to be used for such purposes.[5]

For the foregoing reasons, we reverse the judgment of the district court.

**REVERSED and REMANDED.**

---

[5] In reaching this conclusion we agree with our predecessor circuit's rationale in St. Paul Guardian Ins. Co. v. Johnson, 884 F.2d 881, 884-85 (5th Cir. 1989) (distinguishing Hovater and holding that "the purpose for which the information was collected governs whether [a] report is a 'consumer report' under the FCRA[,]" despite that the insurance company ultimately used the information for the sole purpose of evaluating an insurance claim). See also Comeaux v. Brown & Williamson Tobacco Co., 915 F.2d 1264, 1273-74 (9th Cir. 1990) ("The plain language of section 1681a(d) reveals that a credit report will be construed as a 'consumer report' under the FCRA if the credit bureau providing the information *expects* the user to use the report for a purpose permissible under the FCRA, without regard to the ultimate purpose to which the report is *actually* put."); Ippolito v. WNS, Inc., 864 F.2d at 449-50 n.10 (declining to follow Hovater and reasoning that, "[b]ecause of the circular definition of 'consumer report,' § 1681b's limitations on the dissemination of consumer reports are essentially rendered meaningless if the . . . determination of whether a report is a consumer report is made solely by looking at the reason for which the report is requested").

12